FINAL FORM

# 13-889-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤ ◄◄

LISA B. FRALEY, STEPHEN MARSALA, JR., JOSHUA ADAM MANDELBERGER, WAKANA KAMESATO SEBACHER, TAMMIE FOSSACECA, AHN ROMERO, MARC RYAN FILLARI, MONA AFLATOONI, PAUL THOMAS MORRONE, CHRISTOPHER JOHN HOWE COLLATO, MATTHEW JOHN JEFFERIES, RUSSELL JAMES MONSON, NEIL THOMAS PUNT, MARK M. ULRICH,

*(Additional Caption on the Reverse and Following Page(s))*

———————————

*On Appeal from the United States District Court
for the Southern District of New York (McMahon, J.)*

## BRIEF FOR DEFENDANT-APPELLEE
## KPMG LLP

Michael C. Kelley
Jennifer Altfeld Landau
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California 90013
213-896-6000

Carter G. Phillips
Eric D. McArthur
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202-736-8270

Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
212-839-8555

*Attorneys for Defendant-Appellee
KPMG LLP*

PAUL JAMES DiCARLO, MATTHEW WILLIAM WILPERS, JAE Y. CHUNG, ASHLEY ALBERS
AUSTIN, EMILY DIANE TOWERS, RYAN FARRELL HOLMES, KIMBERLY DANIELLE BLAISE,
VANESSA ANGELIN CASTANO, REGINA V. FARRELL, DANIEL HUEY, DONALD RICHARD
KARR, RICHARD N. TINELLI, PARISSA HANNAH DANESHMAND, JOHN EDWARD
GLOCKZEN, JR., CLARA MARINO, WILLIAM WAITS RAULERSON, MARILYN LOUIS, MARIO
FANI, MARK NIXDORF, MARY BENSON SMITH, MATTHEW MILLS, MEGHAN E. O'MALLEY,
MELISSA GERDUNG, MICHAEL WEICHHOLZ, MICHAEL YOO, MITCHELL A. MELFI,
MORGAN ANN FRAME, NICOLE M. ANDERSON, NIMISH PATEL, OLGA MARTYNOV,
OREALIS MARIE ALVARADO, PARAS H. DAGLI, PETER PANAGOS, RENA ZARAH, ROBERT
LIU, SAMUEL ROBERT YOUNG, SCOTT LORENCE PFISTER, SEVILLE NICOLE CHRISTMAS,
STEVEN GAUL, SUE YEN CHONG, SVETLANA CONDUR, TIFFANY CHUA CHAN, TYONE
GUILLORY, JR., VALERIE TANG, WILLIAM DRZICH, WILLIAM BAXTER, YELENA GLANTS,
YUK N. LI, YULIA BARLAND, ADAM MINSKY, ALEX COOK, ALEXANDER L. DIAZ, ANNA
HUANG, ASHLEE S. VERNER, BENJAMIN D. HARMON, BRANDON BURKLEY, CAITLIN A.
TENNANT, CAROLYN ELIZABETH MAHAR HASSEL, DIANA FAZYLOVA, DOMINICA
BARBER, DOWLING BURKE STOUGH, ROBERT DUSTIN CATHCART, ELISA LEE HUA WU,
EDMUND A. WINDSOR, ERIC VAN FREDRICKSEN, ERIN ELIZABETH HART, ERIN S.
SAUNDERS, GARRETT DEE CAZIER, GREGORY GOLDSAND, HOLLAND STIMAC, JACK YI-
PING TANG, JAMES DOUGLAS NELSON, JEFFREY G. PIKE, JENNIFER LAI, JENNIFER M.
STEWART, JENNIFER MILLS, JEREMY T. FOWLER, JESSICA P. PUCKETT, JIA YIN WU, JOHN
DENG, LAUREN ELIZABETH FRIENDS, LELA MUJAKOVIC, LESLIE L. PERRINE, LINDSEY
MCLAUGHLIN, LISA GRUND, DANIEL ANDREWS, BRIAN EDWARD CAPSTICK, HARRISON
D. COLE, CHRISTOPHER BLAKE ELLIOT, DAEGA FATAH, CLIFFORD HAYHURST, III,
COREY JONES, CHRISTOPHER A. MARINO, ANNE M. MARTIN, EVAN R. PARZYCH,
HEATHER JEAN REEVES PRUDHOMME, ANDREW REHM, EMILIO JORGE SARTORI,
HEATHER SCHRADER, CHAVA S. SCHWARTZ, BRIAN EDWARD STAMILE, MICHAEL IAN
TARRANT, CHRISTOPHER ADAM WADE, EVAN M. ZAWATSKY, JILLIAN BERNARD, JOANNA
CANARAS, ZAHRA J. CASTILLO, MICHAEL CHIULLI, SHIRLEY JEAN CRIDDLE, SHANNON
CUNNIFFE, MATTHEW GIAMMARINARO, JENNIFER M. GRAYSON, JOE MANUEL GUERRO,
LUKE CLETUS IVERSON, WIESLAWA JAMROZ, MATTHEW KUNZ, JAMES W. LEE, III,
JEFFREY MANNING, RYAN B. MARKOWITZ, SARAH JANE MEDRANO, ROBERT A. MILLER,
KANURI BHANU PRIYA, KRISTEN LEIGH PROVIX, PETER JOHN PUGLISI, III, MICHAEL
SANTOLUCITO, LAURA SHUMAKE SAVARESE, JULIET LEE SMITH, MATTHEW B. SMITH,
WILLIAM S. TIERNO, JOSEPH WALTER VAZZANO, SUIHONG WANG, LAURA ANN
WESTENBERG, JASON T. BAILEY, EVE BUCKWALTER, ELIZABETH LEA CHANDLER,
MALLORY BROWN HOIDAL, ZACHARY A. KAYSER, WILLIAM ROBERT KRAFT, JAKE
KRANSTEUBER, MICHAEL MCPHERSON, DAVID CRAIG ROBERTS, ERIN M. ROBERTS,
SCOTT RUMBERG, SEAN W. SULLIVAN, XUAN SUN, MATTHEW TRINH, TRAVIS J. VOGT,
JAISON VOVRA, HONG F. WALROND, KELCIE KIKU BALAEFF, SREYA S. ALEX SAMUEL,
KERRI J. ALLEN, STEVEN CALDER, CAIRO J. CARR, SHO CHINEN, DAVIN LEE COTTLE,
JEFFREY M. CROFT, JACQUELINE MARIE DEMEO, JESSICA DEYO, ALLISON PELTIER
GILLAM, WILLIAM T. GUTKNECHT, CHRISTIAN RYAN DANIEL HALLIGAN, JENNIFER L.
JOHNSON, CHRISTOPHER W. KING, BRETT E. KIRKLAND, MARK EDWARD MARTINEZ,
DANIEL MATTAR, JANA MILENSKY WEISSMAN, BRADFORD MOYE, MAYA E. PROCINSKY,

*(Additional Caption on the Following Page(s))*

MICHAEL RATH, XUEMEI REN, MICHAEL L. STEELE, RYAN S. SVORINIC, RYAN VERKAMP, YUAN ZHANG, KAYLA L. BARRETT, NILES REID BERGSTROM, JILL KAYLEEN COLGAN, KAYLA MARIE FUTCH, JOSEPH GIBSON, KAITLYN HARTWELL, ALLISON C. HYLTON, DANIEL P. JENSEN, LUKASZ KWIATKOWSKI, DANIELA LUNDIN, ALISON J. MOSS, IRFAN A. RAZA, JATINDER SINGH, JIN XING WANG XUE, ALANNA COOPER, ERIN ELIZABETH DONIA, BRIAN ROSS DOUT, ERIKA ELKO, ERIN J. ELLIOT, CHASE MICHAEL GARDNER, KYLE ANDREW GASAWAY, SEAN PAUL HATHORN, RENNIE HENRY, THOMAS M. KERR, III, MAURA HELBERG LANGE, JAMES J. LENIHAN, III, TRINITY MARCIA MASCOLA, JULIAN JOAQUIN MURRIETA, NICHOLAS PAUL NORDMAN, ALAN WILLIAM ROEDER, MATTHEW WENZEL, LAURA WESTENSEE, DAVID JALETTE, ASHLEY MATRAK, ANDREW PULITANO, ALYSON L. REIMER, ALLA SHUTYI, BRYAN VAN DEMARK, DA WANG, EMILIE J. BRITT, JESUS COMENDEIRO, FREDERICK JAMES COWAN, JR., JINA HAN, GEFFERY HUBBLE, JESSICA H. LEONARD, IAN NICHOLS, DREW HARRIS ROSEN, JACOB SPEAR, JONATHAN WIENER, KARA N. BEVIS, STEPHANIE ECKARDT, KEVIN ELLIS, JOSEPH F. FRANZONE, KRISTOPHER GLASER, SAMANTHA M. HUNT, MATEJ KOLLAR, PAUL A. LARKINS, KIMBERLY LAYDEN, JOSEPH T. LEONARD, SARAH K. LINDHOLM, KRISTEN MCFARLAND, REBECCA O'MALLEY, LUKE ORZAG, KATHERINE A. PANZARELLA, MAGEN M. REYOR, ROHINI R. SETH, CHELSEA NEALE COLLINS, JOSHUA TIMOTHY DAHMEN, ASHLEY A. DARDEN, NICOLE DAVIS, JARED BRICE FILUS, ASHLEY HOLMAN, JESSICA MINOR, MELISSA MULICK, WEI SONG, BRIAN WALKER, CHAD W. WONDERLING, KELSEA ECHO YU, STACIA CHARLAND, JENNIFER L. CROWE, JONATHAN DEBEAUMONT, MARC FERRIELLO, DANA MARIE GANSKY, ASHLEY S. GUTHMANN, JOHN HAYS, JEREMY D. KLINE, KELLY MARIE LOCK, SARAH TUCKER MAHAR, KRISTA SUZANNE NIEBRUGGE, RYAN RAY OLSEN PAINTER, KRISTINA RENGEL, CHRISTINA M. SAIA, ANN PATRICIA SALAMUNOVICH, DONALD SHAW, BRENT VETTER, RONG WANG, DAVID W. ALLEN, AMANDA AUTHEMENT, DANIEL A. BENNETT, LEIF E. BERGQUIST, HEATHER K. BLAKE, KERRY L. BLATT, LAUREN M. BROWN, EMMA COLACICCO, ADELE M. DOMINGUE, APRIL L. DOTEN, JAMES W. FORSYTHE, LACY R. GLASER, JEREMY R. JOHNSON, JENNA H. KARMEL, AMIT KUKREJA, JASON LALK, DANIEL N. MARRONE, GLENN PALILLA, JENNIFER M. PEYTON, AMANDA RAHNER, FAY M. RICHARDS, DINO J. ROSSI, CHRISTINA RUIZ MINESIS, CESARIA RUTIGLIANO, FRANK R. SOUSA, HANA STELZER, IDREES TILY, CHERYL TRIPODI, RONGCHEN CHEN, SOPHIA CHOWDHURY, RYAN L. CHRISTIE, SARAH F. KUHNE, SAMANTHA S. LIAO, THOMAS F. LISNICH, YU-HAN LO, REBECCA MOSHER, TERRYANN A. ROBERTS, RENEE A. SAPP, SHIRLEY SUET WAI SO, YULIYA SPEKTOR, TRACY A. TANKARD, MICHAEL ARCURI, DREW R. FROEHLICH, JENNIFER M. INTERLANDI, MICHAEL A. JABLONSKI, MICHELLE M. KRAUSE, CASEY LOCK, SCOTT R. NUNEZ, PRIYA PATEL, KATE PINNEY, AMANDA L. SHAY, INDRE STUNZENAS, KALIOPE TSOFLIAS, ATUL PRASAD ADHIKARY, SISAI A. BIRHANU, VANESSA BURNS, KERI A. EHRLICH, SETH T. FICK, JENNIFER C. HALL, MATHEW J. HOWARD, KATHERINE R. JOHNSTON, BENJAMIN J. SIEWART, MEGAN EILEEN SMITH, ANDREW J. TERRERI, AMY ELIZABETH VOGT, JESSICA LEIGH WILLIAMS, ELISSA SHERYL YORGEY, CANT CHARLES CHRISTOPHER, STEPHANIE R. CONTI, AREN J. COWAN, BRYAN DAVIS, EDWARD DIASIO, ANDREA DIAZ, CARA ANN JUFFER, BRENT E. MCLAREN, ALVARO NARVAEZ, ANTHONY NUSBAUM, BRIANNA R. TRUEX, BRIAN S. ZALEWSKI, BRYAN KYLE ZERR, MICHAEL D.

*(Additional Caption on the Following Page(s))*

DAntonio, Sarah Giltner, Michelle D. Harris, Tracey Monday, Shannon Lee Morrow, Luisana Bonilla OBrien, Zachary A. Schamaun, Vanette E. Torres, Mark Van Winter, Thomas J. Zubulake, Jonathan Bingham, Julia Bushe, Kyle Joseph Chagnon, Laurie Chen, James A. Dorey, Laura Guarraci, John R. Hamill, III, Jennifer Shea Kratville, Justin S. Norton, Gayle Robin Patasnik, Eric Joseph Paulson, Jessica Erin Simpson, Christopher O. Weiss, Justin Gregory Wicks, Joshua D. Bicknell, Christopher M. Chiaraluce, Johnny Acosta, Nathan Fedders, Spannos Christina Papscoe, Kristen Troia, Amir Ali, Amy H. Brousse, Enoch Chung, Dennis M. Delude, Karen E. Gorzynski, Oscar Londono, Sophie Y. Malati, Andrea S. Mosher, Ashley Phillips, Matthew A. Ross, Amanda Rubeor, Damon T. Smith, Kyle A. Starr, Ariel Taylor, Michael T. Visconto, Stephanie M. Adams, Nicole Elizabeth Anderson, Amir F. Aslam, Nathan Edward Bertsch, Paula A. Boone, Christopher Capicotto, Dong Chen, Joel Coffey, David Curtis, Janine Joyce DeJesus, Dominika Ewa Pabon, Arley R. Ewald, Lauren Goldfarb, Bonni Grossman, Scott T. Jugan, Sara A. Lasek, Pietro Maddalena, Jonathan Marr, Rebecca Mielnik, Bogdan Milin, Charlotte Nicholson, Jason Owen, Elliot Parks, Vincent J. Passafiume, Morgan M. Pearson, John M. Pontecorvo, Lauren T. Quinn, Miran Seo, Gina Tricarico, Ramon Valls, Dana M. Van Nostrand, Valarie Anne Vaughan, Jonathan R. Warriner, Hillel Weingarten, Hui Zhi, Yi Zou, John M. Butler, Adam Chrudimsky, Caitlin C. Clark, Zachary J. Cyman, James R. Duncan, III, Christopher Furlong, Matthew C. Gadzinski, Dylan C. Gfeller, Ethan J. Giller, Kristina M. Harrison, Kristin N. Hoffman, Chris Jones, Genna N. Love, Ashley Prosek, Jolene N. Rabena, Michael Spano, Timothy J. Strehlow, Gregory S. Torbic, Thomas B. Wilson, Stephanie A. Yesnofski, Brandon D. Bhagat, Justin B. Bobus, Warren Chen, Aaron Cheung-Kwong Chan, Jason Dale, Donna V. De Vera, BeiLai Ge, Brandon Russell George, Ying Chen McEwen, Ani Susan Menendian, David J. Murray, Katherine L. Nordman, Katherine Omura, Domenico Pontrelli, Sergio D. Ramos, Allison K. Sanden, Kundan Sandhu, Melissa S. Scalici, Lauren Schaefer, Jessica H. Schatz, Chanelle Takemoto, Nathan L. Wilbur, Vera Zhuravleva, Inessa Zolotareva, Yoana Allen, Katherine L. Aye, Casey J. Hocevar, Brittany K. Hopp, Samantha D. Leonard, Timothy McCormack, Eric D. Mead, Sarah E. Morgan, Jason Rosiello, John M. Schenk, Galen P. Ward, Togos Zorig, Vincent J. Battaglia, Jr., Sadie L. Carson, Thomas A. Chon, William E. Cloutet, III, Matthew B. Daniels, Michelle Epstein, Stacey Gill, Lynnie Hickey-Mehic, Vanita Katrina, Tie G. Lasater, Keely O. Lindstadt, Scott E. Midla, Neil M. Morgan, Michelle L. Mysuna, Margo Pacanowski, Zachary J. Pettinger, Samantha Richards, Thomas W. Scott, Tyler Skelton, Joshua D. Smith, Rainy Leforce Spring, Kathryn E. Towle, Ashley A. Adeogba, Jennifer L. Arthur, Nina J. Aves, Drew M. Biddle, Alisha Brumbaugh, Heather Buss, Diana Chia, Janice Daclan, Joseph Decardi-Nelson, Eric Hills, Jaime Hinojosa, Farah Khan, Galib R. Khan, Hyangsoon Lee, Joseph N. Levy, Maile M. Lewis, Jessica H. Lott, Miguel A. Marin, Dean Mattera, Danielle A. McCoy, Allison McGuire, Steven Oscarson,

*(Additional Caption on the Following Page(s))*

JOSEPH J. ROTHER, ANN SALINAS, DANIELLE A. MCCOY, ALLISON MCGUIRE, STEVEN OSCARSON, CHIPMAN R. SEALE, YOUNG SEOH LEE, ANTONIOS SPILIOTOPOULOS, MINA LISA TEYMOURTASH, SHUN TUNG LAM, JEANNINE WHEELER, MELISSA L. BROWN, DANIELLE L. CAHILL, NATALIE C. CUSAT, KRYSTEN M. GENAWAY, ANDREW T. KWITOWSKI, SAVANNAH LEHMAN, WILLIAM S. LOCAKRD, III, ALANNA ZAHORA, MAX H. ESSOH, PATRICK MICHAEL FUNK, PATRICK C. OFORDIRE, DEREK SYKES, SUMI CHOI, ALEXANDRA D. CHOU, ASHLEY PEYTON DISINGER, CATHERINE E. KAYLOR, SARA LENGLER, STEVEN S. MERRILL, DENAIMOU C. N'GARSANET, LAURA RATH, LAURA ELIZABETH REYNOLDS, LESHAWD T. THOMPSON, PATRICK A. THOMPSON, MATTHEW D. YTZEN, BRENT E. ARNOLD, YAELLE E. BERNSTEIN, YUQUIN WEN BOHANNON, EVELYN CHAN, THOMAS J. CHLOE, EVAN M. DASHE, JOSEPH GENTZKOW, KAREN L. JUAN, JOHN P. KINDELIN, JACKSON Y. KUO, JANICE LUO, GREGORY T. MONTGOMERY, LISA M. MORGADO, ANDREW J. PORUBCAN, JING TAO, TAKEO UCHIDA, JASON R. WALTER, CHUN Y. ZHANG, SU ZHENG, WILLIAM L. FINE, AMY A. HILLENBRAND, STEPHANIE N. JOHNSON, BENJAMIN JURGENS, PHILIP MEZHERITSKY, JUSTIN N. BEEBE, KATHERINE M. BEEBE PICKERT, CHRISTINE L. BLAYLOCK, GAELAN BOSS, ANNA E. BROUDY, COLLEEN M. CATALANO, ERIC DICKINSON, MANAL ELHAG, JOHN G. ESTELLE, JOHN P. HARRIS, ANDREA HENRY SPECK, JENNIFER L. HOWELL, JOHN M. JAMBERS, DIANA S. JOHNSTON, JAMES R. KIRIHARA, JULIE M. KNIGHT, DAVID KOEHLER, MICHAEL H. LOVECRAFT, KEVIN KEUN W. PAK, MATTHEW A. PITETTI, CHRISTINE A. REED, LEIGH ANNE ROZYCKI, MEGAN P. SATO, MELISSA STOKES, MATTHEW S. TAYLOR, KEN UKAI, LAZARUS W. VITTAS, ERIN C. WALLS, DUSTIN F. WHITE, YIM CHI CHENG, VIRGINIA GRZENIA, PAMELA S. LEE, NATALIE MARSHALL, CHARLES E. MERTZ, II, JILL N. MINSHEW, SHAWN M. PARENT, ROBERT G. PYRZ, ROBERT G. PYRZ, MATTHEW SCHWERIN, PAUL R. SCOTT, RICHARD S. SEGER, III, SARAH R. SIMS, UYEN TRAN, SPIRO M. DOUNIS, PAUL KREGER, LEO A. MATZ, KIN KEI KEVIN MOK, NICHOLAS S. WINKLER, MYRA S. ASLAM, CHARLES BAUMANN, STEPHEN BOSCOLA, ALISON G. BROOKS, RYAN D. CARR, BRIAN J. COGLEY, JESSICA R. CONWAY, TIMOTHY DELUCA, BOBBIE JO EMOND, ASHLEY E. FALTER, DAVID S. GUY, TANYA R. MAZAKIAN, MEGAN L. OPSAHL, JULIAN PAIK, JEFFREY W. PARAMORE, ARPAN PATEL, ALANA PERINI, LAUREN PLUMLEY, DAVID B. REITER, STEVEN B. RUSSELL, JORDAN SAMET, ROSS SILVERMAN, MATTHEW SKELLAN, RACHEL A. STUART, GORDON E. WALTERS, PETER W. WONG, KEVIN W. YOUNG, BRIAN ASCENIO, KERRI BLUM, KYLE V. BROWN, THADDAEUS M. BURGESS, NATHAN E. CARLTON, PETRUTA L. GANTOI, MICHAEL D. GOGOLEN, RONDAL HARRIS, JR., TAMARA R. HOOK, MICHINORI KANEKO, SARA LEE, FADIL LIMANI, PRPARIME LIMANI, JENNIFER A. MATOUS, SEAN A. MCGOVERN, BRITTANY L. PANCHERI, KELLY B. POSTEN, JESSICA R. PRESTON, THOMAS A. REID, DAVID CHARLES ROBERTSON, ALISON M. ROONEY, JILLIAN SCHLAUD, ROBERT L. SCHLAUD, JR., JACOB O. TECH, JUSTIN M. TERZO, WONDIRAD A. TSEGAYE, EDWARD A. VALENTINO, CHRISTOPHER A. WELCH, DAVID C. WHITNEY, ANDREW J. ZENS, JOHN C. ADRIAN, KYLE L. ALEXANDER, AILDA ALUSHI, CHARLES W. CRAWFORD, ERIN DIFFLEY, JENNI L. DOLLAHON, HOLLY C. DONLEY, MEGAN R. GILBERTSON, BENJAMIN D. GOODE, ERICA A. GOODE, KARA A. PAULUCH SCHRODER, DANIELLE M. ROCHE DUPLESSIS, LAUREN SELLARI HUFF, TERESE V. STREHLOW, KATHERINE A. SWEET, SCOTT D. UNNERSTALL,

*(Additional Caption on the Following Page(s))*

QIONG WANG, LILLIAN N. FRAGUADA VIALIZ, ARTSIOM ANISKO, KARISHMA BARUA, JIESI CHEN, SHANNON COMRIE-BOOTH, ZACHARIAH COOPER, JEREMY P. DUGAN, NATHANIEL EDELMAN, EDWARD A. GARCIA, KEIKO HIRAKAWA, CONNIE M. HU, BRADLEY K. JASTROW, XUEJIAO JIANG, ANTHONY KIMANI, EMILY KUPEC, SAMUEL A. KUZNETZOFF, TIMOTHY D. LONG, MICHELLE S. LUK, TIMOTHY I. MILLER, MARY E. NADJARIAN, KELLY PRICE, JANETTE RICKS, IVI SANTOSO, BRYAN SCHROEDER, ALEXANDRA K. SNUKAL, YOUNG TAK SONG, SHIRLEY-MAY SOONG, MIKIKO SUGAYA, CHRISTINE SULLIVAN FRAGA, JAMES R. TAYLOR, JENNIFER THOMPSON PETER, JAY M. VERRILL, TRAVIS J. VIERA, WINLY VUONG, VALERIE WARE, ANGELA WEN-AN YU, DENISE WORSLEY, JONATHAN W. WRIGHT, THOMAS X. YAO, XIAOJUAN CHEN, EBONY HARRIS, JAMES RINALDI, STACEY M. ZAFIROFF, MICHAEL S. BECKER, JEFFREY BLAND, ADAM L. BOCKMAN, RONAK BRAHMBHATT, IRINA BRIMMELL, KELVIN G. CHENG, MEGHAN R. COOPER, SEAN P. FISCHER, MARCUS A. FLYNN, SARAH N. HARPER, PAULETTE M. HEUR, LORETTA G. HILL, KELSEY E. HOFACER NEEL, WEILL HSU, DAVID A. JOHANSSON, AMANDA K. JOHNSON, ROBERT D. JONES, VALERIE T. KAUFMAN, PAUL W. KEMP, KEVIN D. KNIPP, MERLYN A. KUSHNER, ADAM D. LAKE, ALLISON A. LESLIE, KANG LI, SARA MAGGIO, ANNE MALE, ADAM T. MARCHANT, MARISSA MAYHORN, TERRANCE L. MCKNIGHT, JONATHAN T. MCPHARLIN, ROBERT J. MIRANDA, KRISTEN L. MUNCIE, ALIESHA NATHU, ELIZABETH A. PALMERI, MATTHEW C. REIGHARD, WILLIAM B. ROSS, POONAM SAKHRANI, ELIZABETH M. SIMMONS, STEPHANIE C. SNODGRASS, JUSTIN SPIKE, SARON H. TEGEGNE, KATIE L. THOMAS JACKSON, MARIA G. TRUJILLA, KIERA J. WATSON, ERIC R. WILSON, ERIC YU, JEFFREY W. BARLAM, MATTHEW M. CLAYTON, SHELLEY GULATI, CHRISTINA RULZ, TYLER J. WHITAKER, AMBER M. AHSMANN GOLDMAN, MARGARET L. AYCOCK, SARAH N. BOCKS, MATHEW BRINSDEN, JAMIE BUENZOW, JAMES A. BUMBULSKY, RINKY CHOPRA, KIMBERLY C. CONNER, KATIE COX WESTGARD, MARK J. DELUCA, ANNA C. GULLICKSON, THOMAS HISTED, ALYSON P. LEDESKY, DOUGLAS D. MARTINE, PAUL M. MASTARONE, REBECCA J. MASTARONE ELLIOTT, CRAIG MCNEILL, PEDRO LABORDE MUNIZ, NICHOLE A. SERINO, MARC JACOB SHELTON, CHAU M. TA, EVAN L. WILK, MEGAN WILLIAMS, DAVID B. BAWEL, KINGMAN CHAN, JR., MEGAN ERWIN, JAVONNA E. JAMES, BRADLEY T. OWENS, KEITH B. PAPISH, LYNN K. SPOKAS, MICHAEL W. TRUETTNER, BENJAMIN B. ANDERSON, SCOTT CAMPOBENEDETTO, JENNA N. COFMAN, MICHAEL CRNKOVICH, FAICAL ELHAJJAM, BOND N. FERGUSON MUNSON, TIMOTHY D. JOHNSTON, BRYAN A. KEELE, DAVONA KELLY, YELENA KOTSAR, CONSTANCE LEUNG, MENG LOR, SARAH MCCUE, WASSIM BERRO, HECTOR ESTRADA, JULIAN D. LEE, LAUREN LIPPINCOTT DARSEY, KATHLEEN M. AUTRY, BRIANA G. BISHOP, WENDY R. DALRYMPLE, EDWARD DEMONE, STEVEN P. DUFFY, MADISON R. DUVALL, GRACE T. GUTBERLET, JUSTIN T. MAIER, BRADLEY A. OMALLEY, DANIEL REX, SARAH J. ROSS, STEVEN T. SHULTHIESS, ALLISON K. SLIFE HRITZ, MICHELLE L. SZAMES, ADRIENNE D. TANKER, COURTNEY ANN WIEGARD, ADAM G. AVNI, ELIZABETH H. CUNNINGHAM, PATTANAN DECHARAVEEROJ, MELISSA K. LANGONE, MENG-LIN MONA LU, DAVID C. ORASIN, HOLLY M. SAXBY SOWERSBY, DANIEL P. THOR, KELLY VI, JILLIAN M. MCCOOL, KATSIARYNA TSYBINA, FRANCIS ADAMS, HERMINE BARSEGHIAN, JENNIFER K. BAUMAN, ALLISON CHEN, BRANDON GEMOLL, CHRISTINE ANN GIBSON, ALEXANDER J. GILBERTSON, JOHN STEVEN HILBORN,

*(Additional Caption on the Following Page(s))*

HEIDI LYNN HOLMES, CONNIE HORNG, DAVID KANG, CARLI KISABA, CRISTOBAL LAMAS, ALLISON LEIGH MOORE, AUSTIN R. LEWIS, BRENNAN J. MALONEY-KRIPS, AMANDA J. MYERS, BRYAN PATRICK NELSON, ERIC M. PANNELL, CODY PARKER, ANKUR B. PATEL, JOEL B. RINTOUL, BRETT I. SILVERMAN, ANNMARIE STUART, JOVAN TUCKER, ALEXANDER VYSHETSKY, ASHLEY N. WESTMORELAND, CALVIN WU, ANGELA YU, SHANAN AHMED, RONALD F. BECK, T'LANE B. BRIGGEMAN, TERESA CARRANZA, KRISTEN CHONG, NICOLE C. DORAN, KUNAL DUDHEKER, THOMAS DUFRESNE, SHANE HUIBERTS, ROBERT KARR, THOMAS P. KEEGAN, REBECCA A. KRAMMEN, MONICA L. LONG, SHUANG LU, KEENAN JAMES MCCULLOUGH, TREVOR D. MCKENDRICK, KELLY MERIANO, STEVEN MURPHEY, MEGUMI KOMIYA NAKAMURA, MICHELLE OKABE, NICHOLAS A. PAONESSA, SEAN M. PAUL, NEIL SHAH, RAYNA J. SWANSON, THOSANA TAN, SERGEY TKACHEV, TRACIE TOGAMI, KRYSTLE TOLENTINO, MOONY C. TONG, KENNETH TY, STEPHEN VAN LYON, SARAH VANLANDINGHAM, KATRINACA E. WARE, VICTORIA E. WHELAN, SELENA R. BAILEY, COLLEEN BRENNAN, KRISTINA M. BROSS, ELIZABETH D. BROWN, CHRISTOPHER J. CALVEY, LAUREN DANIELLE CAPLAN, SUSAN CHARTIER GOMES, DAVID E. CHINOSKI, KRISTEN M. COULOMBE, CHRISTINE DEBONEE LABRIE, KRISTINA ENG, VINCENTE FIGUEROA, HAYLEY L. FORD, ABBY GRIESEDIECK REEVES, DAWSON HALE, JORDAN A. HANDSAKER, CALEB E. HANSON, AMANDA S. HOFFMAN, ALAINA JO, JEFFREY V. KENT, JR., KYLE E. LANGNER, REANNA D. LEITAKER, MICHAEL L. LEMBO, EDWARD H. LEVY, MARVIN K. MAYOTTE, RACHEL N. OTLEY, DANIEL PARKS, CAROL A. PARRISH, DAVID PIATEK, MICHAEL D. PICK, YANINA REZNIKOV, MARISA SALERNO, AUBREY A. SCHMIDT, LENNON SMITH, EUN HYE SUNG, THAI TRINH, SHAVON TUCKER, MICHAEL VAHIDTARI, ALMAN M. WAHDAN, MATHIEU WEILL, GENEVA WIGFALL, MATTHEW E. WREN, DOSANNA WU, DANIEL WULLSCHLEGER, EMILY R. BORIACK, TRENT C. BROWN, CONNOR DONNELLY, PETER J. HELF, CHAD B. UNDERWOOD, DEL CIELA BASILIO, EMILY BOECKMANN, SARAH E. CALLAN STANCLIFT, WINNIE CHAN, LOGAN J. CHRISTIANSON, ROBERT S. CHUN, ADAM D. COLBA, MICHAEL D. CORIELL, MICHAEL W. DERINGTON, MICHAEL J. FEDUN, BRITTANY L. FEDUN FIGLIOLINO, CHRISTOPHER M. FERRELL, ZEB F. HIGH, JR., RACHEL HOUDEK, PRESTON JEUNG, SUNITA KUMAR, ANDREW V. LINVILLE, KEVIN M. MCBRIDE, ELIJAH MCINTOSH, STEVEN A. MICH, ERIC NOWAKOWSKI, STACIE M. ONKEN, YULIA SHMATKOVA, MICHAEL T. STORIN, ADAM TRAVIS, SAMANTHA ZIMMER, JUSTIN B. COOK, DIANA A. MCARDLE, PENELOPE YURKOVICH NORMANDIN, MARIA DEL MAR HERNANDEZ, CARMEN M. TELLEZ, MEGAN E. TOMS HUMBER, AARON D. GOODMAN, CLAYTON J. HUFFMAN, RYAN J. KEYS, SAKINA KHAN, XM T. KHAW, ELIZABETH REISMAN, DAVID D. THOMAS, LISA A. BLAND HORTON, KRISTEN N. KELLY, MELISSA MCQUEEN CURL, MEREDITH ROGERS MCCARTHY, RYAN M. SWANER, STEPHANIE M. ALDECOA, KIMBERLY ARGY, LISA M. BAKER, JESSICA R. BECKENDORF, JOELLE M. BROWN, ROSS BRUENING, JONATHAN W. CADWELL, DAVID C. CARLEY, CHRISTINE CHIARAMONTE, ANDREW J. CHOLY, MICHAEL DETER, NICHOLAS A. EBERSOLE, RACHEL M. ENGLISH, SARA R. FLOREANI, SANTO S. GRAMANDO, III, DAVID HA, DALIA KLIMKOWSKI, MARK KRAMER, CHRISTOPHER K. LEE, YU JIN LEE, LUCORIN J. MATHIS, ANTHONY J. MATULAC, DANIEL T. MCNEVIN, KRISTINA MENDEZ, AMANDA MENNITI, JOEY RODRIGUEZ, IAN A. RUDDOCK, DANIEL R. SABET, MIA K. SAILS, KATRIN D. SALTA,

*(Additional Caption on the Following Page(s))*

FATIMA SEDIQZAD, JEEVANJIT SINGH, CRENA E. SPRAGUE, CHRISTOPHER I. STROTHER, DAVID SUH, THOMAS R. TARSITANO, EDMUND TONG, GUILLERMO E. TRIGO-MENDEZ, NY-LIANG WANG, RICHARD L. WARD, ALEXANDRA WITTENBERGER BAKAMUS, BILL R. WLECZYK, ERICA YAMAMOTO, CAROLYN YIP, HUIFANG ZHU, JAN-MICHAEL DE VERA, DAVID P. GRIMNER, RONALD KARROLL, JR., MATTHEW A. LAPOINTE, JONATHAN D. LEINS, JACOB R. LINVILLE, RYAN MEALS, YULIANA RUFF, JAMES K. RUSSELL, JASON SATTAR, NOAH SULLUM, NABIN BANSKOTA, THERESA KHUU, SAMATHA M. SNYDER LANCE, JUAN P. BARAJAS, MATTHEW BIRMINGHAM, CHRISTOPHER L. BURGESS, PHILLIP M. HEU-WELLER, TUAN PHAM, RONNIE ZABIGUY, DANIEL COLVIN, ADESUWA ASEMOTA, KERRY ANN BERG, ASHLEY BILLINGER, DANIEL CHEN, KELLY A. CLARK, JEROMY R. DAVENPORT, MARK A. DEBONEE, CRISTINA MARIE DEL BUONO, STEPHEN F. ENDRES, ERIN M. EVERLY, TOMOKO FURUKAWA, ANDREW J. GALLEGOS, RACHEL L. GUILD, TAMEKA L. HAMMOND, ANDREW HARDY, DAYNA E. KITTER, NEIL L. KOROTKIN, VANYNA M. LOUIS, KATLIN A. MICK, MEGAN ORR, CHRISTEN A. PAGE, ROBERT M. PETERSEN, ANTON SAMRAI, SEAN SCHRAM, JENNIFER D. SING, BRIAN D. STOCK, KATHERINE L. THOMPSON, ASHLEY M. TURNER, SAUL VERBERA, JENNIFFER VIELMAN-VASQUEZ, RICHARD ARMSTEAD, ERICA BARHAM, DIEGO A. BELLO, MATTHEW T. HAINES, AMANDA B. KANE, CARLY N. KINTZING, KEVIN M. OLKOWSKI, MARIA RIVERA, STEPHANIE T. UNKART, KENJI NONAKA, ROBERT III VIDAL, MYLA N. CHATMAN, ZHANNA A. FREEMAN, SUMIAH A. JABER, SARAH KONEMAN, VIVIAN K. LAU, DANIEL MCCORMICK, SANDRA RAK, DAVID C. SCOTT, DAVID C. SCOTT, BRIAN SHAW, DEREK P. SNIKERIS, RYAN M. SPURLOCK, KUMIKO TANAKA, ELLEN VOLODARSKY, KRISTIE DAVIS ZAPF, AMIRA MORIS FARAG-BESHAY, HEATHER L. HALL, MATHEW S. HANLEY, FRANCINE HOYLE, LAUREN E. INSCHO, JENNIFER KLINE, DANIEL J. ROBERTSON, ANITA J. TSE, MUNEHIKO YUZAWA, MARC C. ABRAHAM, JULIA ABBOTT, MAYA ABDULKARIM, KYLE L. FLETCHER, OLGA V. IVANOVA-MENDEZ, IGNATIUS JACKSON, SEAN MCKENNA, SHARON BRICKMAN, NOELLE M. CARLO, CHRISTOPHER R. DOTSON, CARA S. GRIECO, JENNIFER H. HEIST, JAMES D. MCCLELLAND, JR., LAUREN A. MORRIS, DEREK W. RICHARDSON, ERIC YEE, ASHLEY BROOKE STROBEL, JESSICA MARIE BUSHEY, ELIZABETH CHO, MAI ENDO, SHAWN L. HATFIELD, GABRIEL KANGAS, ANTHONY K. LAGAT, LAUREN C. THORNTON, MICHAEL WELTON, REUBEN ABITBOL, ARI MICHAEL BARUCH, THEOPHILOS S. CONSTANTINOU, LISA M. DEANE, MATTHEW R. GRIFFIN, JOSEPH KAUFMAN, LESLIE KEATHLEY, STACY MCGOLDRICK, CHENGCHENG SHI, KRISTINE P. SOMERA, JILL LEAH STANLEY, ANNETTE SABRINA WILLIAMS, BETHANY N. ADAMS, CHARLES CONRAD BOETTGER, SHAWN O. GILLESPIE, MARINA KALAN, ANDREW JOHN LEAVITT, ALBERT LI, SARAH L. LUNA, JEFFREY P. MCNERNEY, KAREN MEYERS, JENNIFER RIOS, JESSICA H. SCHATZ, LILY SITU, HEIDI SMILDE, ZHEN SU, PHILIP TWEDE, FLORA KANG-JUNG WANG, HUA-JUNG YU, NATHAN ANDREW BELL, KRISTEN BURBANK, MICHAEL DEAN DAVIS, DAVID EDWARD FELDMAN, LEIGH GEIST, MUHAMMAD UMAR HAMID, KATHERINE ANNE KILGORE, CHARITY NICOLE LEE, LACRESHA ERONNE MILLNER, ANTHONY SASSALI, RYAN STROUT, DANIEL HADI TABLE, ROBERT C. THAYER, LINA WANG, ANGELA GUERRERO WILLHOFT, TANIA RHANDA AHMAD, HUSSEIN SALIM ALLIBHAI, AUBREY MARIE BICKMORE NEELEY, HEATHER L. BORING, ANDRE COMPARINI, MARK PRESTON BROUGH, BRITTANY NICOLE LAY, GREGORY ALAN MORSE,

*(Additional Caption on the Following Page(s))*

STEPHANIE PHAM, RANDY R. PLACZEK, ROBERT REDLING, AMANDA SHATZMAN, ADAM JOSEPH DE LEUV, KARIMA WARNER, DYLAN WILLIAMS, HENRY YMAS CROCKERHAM, JR., LESLIE ELLEN DAVIS, JOHN DEVECCHI, JR., ASHLEY ROSANNE DWYER, KEVIN JOSEPH HANNAN, AMY HERTZ, JING HUANG, MOHSAN KHAN, LAP SHUN KO, ERIKA RYAN LARSON, PEGGY LIU, PATRICK J. MCCADDEN, ROBERT M. MERENDA, JR., NITIN MUNDRA, JARED PAUL NEELEY, CHEN NI, CHRISTINA MARJORIE PANAGEOTOU, HEATHER R. ROGERS, PHILIP TUINUKU SMITH, KYLE VITALE, WILLIAM J. CASH, JOSEF H. FARBSTEIN, OMAR J. NIEVES, JENNA L. ANDERSON, CHRISTOPHER D. BUSHEY, JOON HWAN BYUN, URIM CHOI, ANDREW T. COX, DAVID FREUND, PATRICK J. GARBANI, JASON HUISMAN, JOHN LAVIN, JEANETTE L. PECK, JONATHAN POLDAN, JEFFREY T. WONG, ANTHONY C. ZACCARELLI, BROOKE A. BALLANCE, KEVIN BEKAS, EMILY BARZEE HERRICK, TAEOOK KWON, TRISHA LEWIS MARTIN, ERIK H. OLSGAARD, VINCENT PISANO, COLIN SHINNERS, SATOMI TAKAHASHI, ASHLEY TINNIRELLA, PRIYA VASUDEVAN, OBIANUJU LINDA-MARY EKWEGBALU, MICHAEL A. LEVIN, DAVID B. LANDRUM, MIKI NAKAZAWA, STEVEN G. OHL, JENNIFER BAI, KYLE BAKER, FELICIA BRENNER, CHRISTOPHER CACANINDIN, PATRICK CHAN, EDWARD FREIWALD, BRYAN GOLDFINGER, STEPHEN HERZWEIG, ASHLEY JOHNSON, LESLIE JORDAN, ANDREW KATZ, LAURYN KING, JEFFREY KOSLOW, THU LAM, LI LIU, HEATHER MORELAND, KETURAH MOSS, OLUTOSIN OKUNOREN, CONSTANCE ONYIAH, ROBERT PABST, ANTOINE RAIE, MATHEW ROPPO, ANNA SHEYNKMAN GORIN, MELANIE SO, BRYAN STANISZEWSKI, BRETT STIEGLITZ, JESSICA VAVITHES, JULIE WILSON, MELISSA BROWNFIELD LUISO, JAMELLE A. NELSON, SAMANTHA ANDEREGG-BOTICHI, TIA ALISHA FINN, MICHAEL ADDISON HARRIS, KEI KURAMOTO, HUI SHAN SEE, LETICIA FACUNDO, MICHELLE GARCIA, NORBERT MENDONCA, SZIMONETTA PETTERMAN, ARLENE RIDGEWAY,

*Plaintiffs,*

KYLE PIPPINS, individually and on behalf of all others similarly situated,
JAMIE SCHINDLER, individually and on behalf of all others similarly situated,
EDWARD LAMBERT, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

*v.*

KPMG LLP,

*Defendant-Appellee.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, KPMG LLP

(KPMG), a limited liability partnership, certifies that it has no parent corporation

and no publicly held corporation owns 10 percent or more of an interest in it.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ..............................................................iv

COUNTERSTATEMENT OF ISSUES ...................................................1

STATEMENT OF THE CASE .............................................................1

FACTUAL BACKGROUND ................................................................3

    A.    Statutory and Regulatory Background .................................3

        1.    The professional exemption under the FLSA ...........................3

        2.    The profession of accounting ....................................4

    B.    Factual Background .................................................8

        1.    KPMG's audit practice ..........................................8

        2.    KPMG's hiring criteria ..........................................9

        3.    KPMG's training .............................................11

        4.    The role of Associates .........................................12

    C.    Proceedings Below .................................................14

SUMMARY OF ARGUMENT ..........................................................17

ARGUMENT .............................................................................20

I.    THE DISTRICT COURT PROPERLY RULED THAT KPMG'S
ASSOCIATES ARE EXEMPT PROFESSIONALS ...................................20

    A.    Associates Possess Advanced Knowledge That Is "Customarily
Acquired By A Prolonged Course Of Specialized Instruction."........20

        1.    Associates have CPAs or are CPA-eligible, for which a
prolonged course of specialized study is a prerequisite...........22

        2.    The exemption applies notwithstanding that KPMG
occasionally has hired not yet CPA-eligible Associates...........24

      3.      Neither KPMG's training nor Associates' on-the-job experience vitiate the advanced knowledge Associates need and already possess when they are hired..........................26

  B.    Associates' Primary Duty Requires Advanced Knowledge. ..............31

      1.      Associates' primary duty is to perform audit work in accordance with professional standards....................31

      2.      Associates could not perform their primary duty without the advanced knowledge they obtained in college. .................34

      3.      Associates' primary duty is predominantly intellectual in character and includes work requiring the consistent exercise of discretion and judgment. ........................36

      4.      Plaintiffs' contrary arguments lack merit. ................42

II.    THE COURT DID NOT ABUSE ITS DISCRETION IN DENYING PLAINTIFFS' MOTION FOR ADDITIONAL DISCOVERY...................52

  A.    Plaintiffs' Conduct Forecloses Their Argument That The District Court Abused Its Discretion...................................54

  B.    Plaintiffs Obtained Extensive Discovery And Failed To Diligently Pursue Evidence That Was Readily Available To Them........................................................................................57

CONCLUSION ...................................................................61

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Auer v. Robbins*,
   519 U.S. 452 (1997).........................................................43

*B.F. Goodrich v. Betkoski*,
   99 F.3d 505 (2d Cir. 1996), *overruled on other grounds*,
   *New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003) ........ 52-53, 58

*Bell v. Callaway Partners, LLC*,
   394 F. App'x 632 (11th Cir. 2010) ....................................................23

*Boucher v. Sears*,
   No. 89-1353, 1995 WL 283742 (N.D.N.Y. May 8, 1995) ................................56

*Brickey v. Dolgencorp, Inc.*,
   272 F.R.D. 344 (W.D.N.Y. 2011) ......................................................53

*Brock v. Nat'l Health Corp.*,
   667 F. Supp. 557 (M.D. Tenn. 1987)............................................ 50-51

*Christopher v. SmithKline Beecham Corp.*,
   132 S. Ct. 2156 (2012)..................................................................4

*Comer v. Walmart Stores, Inc.*,
   454 F.3d 544 (6th Cir. 2006) ...........................................................53

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
   842 F.2d 612 (2d Cir. 1988) .......................................................57, 59

*Contemporary Mission, Inc. v. U.S. Postal Serv.*,
   648 F.2d 97 (2d Cir. 1981) ............................................................58

*De Jesús-Rentas v. Baxter Pharmacy Servs. Corp.*,
   400 F.3d 72 (1st Cir. 2005)...................................................... 34, 46-47

*Demery v. Extebank Deferred Comp. Plan (B)*,
   216 F.3d 283 (2d Cir. 2000) .......................................................56, 58

*Donovan v. Burger King Corp.*,
   675 F.2d 516 (2d Cir. 1982) ...........................................................31

*EM Ltd. v. Rep. of Arg.*,
    695 F.3d 201 (2d Cir. 2012) ...............................................................52

*Faber v. Metro. Life Ins. Co.*,
    648 F.3d 98 (2d Cir. 2011) ...............................................................49

*Filiatrault v. Comverse Tech., Inc.*,
    275 F.3d 131 (1st Cir. 2001)...............................................................56

*In re Fosamax Prods. Liab. Litig.*,
    707 F.3d 189 (2d Cir.), *cert. denied sub nom.*
    *Secrest v. Merck, Sharp & Dohme Corp.* 133 S. Ct. 2783 (2013) ....................49

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    130 S. Ct. 3138 (2010)...............................................................6, 7

*Grace v. Family Dollar Stores, Inc.*,
    No. 08-1932, 2012 WL 3191354 (W.D.N.C. Aug. 3, 2012)............................51

*Hendricks v. J.P. Morgan Chase Bank, N.A.*,
    677 F. Supp. 2d 544 (D. Conn. 2009)...............................................................50

*Hines v. State Room, Inc.*,
    665 F.3d 235 (1st Cir. 2011)...............................................................48

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
    891 F.2d 414 (2d Cir. 1989) ...............................................................60

*Jones v. Hirschfeld*,
    No. 01-7585, 2003 WL 21415323 (S.D.N.Y. June 19, 2003)...........................56

*Kadden v. VisuaLex, LLC*,
    910 F. Supp. 2d 523 (S.D.N.Y. 2012) ...............................................................26

*In re KPMG Wage & Hour Litig.*,
    No. 07-4396, 2012 WL 5416939 (C.D. Cal. Oct. 19, 2012) .................30, 46, 49

*Lambert v. KPMG, L.L.P.*,
    No. ESX-L-5225-11 (N.J. Super. Ct. Law Div. Aug, 2, 2013),
    *appeal filed* (N.J. Super. App. Div. Sept 13, 2013)...........................................59

*Lumbermens Mut.Cas. Co. v. RGIS Inventory Specialists, LLC*,
    628 F.3d 46 (2d Cir. 2010) ...............................................................56

*Marx v. Friendly Ice Cream Corp.*,
    882 A.2d 374 (N.J. Super. Ct. App. Div. 2005) .................................................51

*Mudgett v. Univ. of Pittsburgh Med. Ctr.*,
    No. 09-254, 2010 WL 1838413 (W.D. Pa. May 6, 2010) ..................................29

*Mullins v. City of N.Y.*,
    653 F.3d 104 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1744 (2012)............. 48-49

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.*,
    265 F.3d 97 (2d Cir. 2001) ..................................................................................58

*Oneida Indian Nation v. City of Sherill*,
    337 F.3d 139 (2d Cir. 2003), *rev'd on other grounds*,
    544 U.S. 197 (2005)..............................................................................................56

*Owsley v. San Antonio Indep. Sch. Dist.*,
    187 F.3d 521 (5th Cir. 1999) ........................................................21, 34, 46, 48

*Paddington Partners v. Bouchard*,
    34 F.3d 1132 (2d Cir. 1994) ........................................................52, 57, 58, 60

*Piscione v. Ernst & Young LLP*,
    171 F.3d 527 (7th Cir. 1999), *overruled on other grounds, Hill v.
    Tangherlini*, 2013 WL 3992935 (7th Cir. Aug. 1, 2013) ..........................*passim*

*Ramirez v. Yosemite Water Co.*,
    978 P.2d 2 (Cal. 1999) .........................................................................................51

*Ramos v. Baldor Specialty Foods, Inc.*,
    687 F.3d 554 (2d Cir. 2012) ......................................................................33, 44

*Reich v. Wyoming*,
    993 F.2d 739 (10th Cir. 1993) .................................................................21, 32, 45

*Rutlin v. Prime Succession, Inc.*,
    220 F.3d 737 (6th Cir. 2000) .........................................................21, 32, 34, 45

*Solis v. Washington*,
    656 F.3d 1079 (9th Cir. 2011) ...........................................................................21

*Stevins v. Provident Const. Co.*,
    137 F. App'x 198 (11th Cir. 2005).....................................................................29

*Talk Am., Inc. v. Mich. Bell. Tel. Co.*,
   131 S. Ct. 2254 (2011) .................................................................43

*Taylor v. Autozone, Inc.*,
   No. 10-8125, 2012 WL 254238 (D. Ariz. Jan. 27, 2012)....................51

*United States v. Arthur Young & Co.*,
   465 U.S. 805 (1984).....................................................................6

*Whittlesey v. Union Carbide Corp.*,
   567 F. Supp. 1320 (S.D.N.Y. 1983), *aff'd*,
   742 F.2d 724 (2d Cir. 1984) .........................................................51

*Williams v. R.H. Donnelley, Corp.*,
   368 F.3d 123 (2d Cir. 2004) .........................................................60

*Wills v. Amerada Hess Corp.*,
   379 F.3d 32 (2d Cir. 2004) ...........................................................52

*Wyly v. Weiss*,
   697 F.3d 131 (2d Cir. 2012) ...........................................................5

*Young v. Cooper Cameron Corp.*,
   586 F.3d 201 (2d Cir. 2009) ....................................................21, 24

*Zahorik v. Cornell Univ.*,
   729 F.2d 85 (2d Cir. 1984) ...........................................................54

STATUTES AND REGULATIONS

29 U.S.C. § 201, *et seq.*............................................................................3

29 U.S.C. § 213(a)(1)...............................................................................3

22 Tex. Admin. Code § 511.122(c) ..........................................................42

29 C.F.R. § 541.202 .........................................................................44, 47

29 C.F.R. § 541.300(a)......................................................................3, 17

29 C.F.R. § 541.301 .................................................................*passim*

29 C.F.R. § 541.700 ...................................................................31, 32, 45

29 C.F.R. § 541.703(a).................................................................32, 33, 45

29 C.F.R. § 541.704 ...............................................................................46

69 Fed. Reg. 22122 (Apr. 23, 2004) ..............................................*passim*

Conn. Agencies Regs. § 20-280-24(e)(1)-(3) ........................................42

Or. Admin. R. 801-010-0065(3) .............................................................42

**RULES**

Fed. R. Civ. P. 56 .............................................................................27, 56

**AUDITING AND QUALITY CONTROL STANDARDS**

AS No. 3, *available at* http://pcaobus.org/Standards/Auditing/Pages/
Auditing_Standard_3.aspx....................................................7, 14, 41

AS No. 9, *available at* http://pcaobus.org/Standards/Auditing/Pages/
Auditing_Standard_9.aspx............................................................7

AS No. 10, *available at* http://pcaobus.org/Standards/Auditing/Pages/
Auditing_Standard_10.aspx..........................................................7

AU § 150.02 (2010), *available at* http://pcaobus.org/Standards/Auditing/
Pages/AU150_02.aspx.............................................................7, 39

AU § 150.02, *available at* http://pcaobus.org/Standards/Auditing/Pages/
AU150.aspx .............................................................................7, 8

AU § 230, *available at* http://pcaobus.org/Standards/Auditing/Pages/
AU230.aspx ...............................................................................39

AU § 230.02, *available at* http://pcaobus.org/Standards/Auditing/Pages/
AU230.aspx .............................................................................7, 8

AU § 230.07, *available at* http://pcaobus.org/Standards/Auditing/Pages/
AU230.aspx .................................................................................8

AU § 230.08, *available at* http://pcaobus.org/Standards/Auditing/Pages/
AU230.aspx ...............................................................................37

AU § 311.12 (2010), *available at* http://pcaobus.org/Standards/Auditing/
    Pages/AU311.aspx ...................................................................................7

AU § 311.31, *available at* http://www.aicpa.org/Research/Standards/
AuditAttest/DownloadableDocuments/AU-00311.pdf ...........................................48

AU § 316.02 (2010), *available at* http://pcaobus.org/Standards/Auditing/
    Pages/AU316_02.aspx .............................................................................12

AU § 316.13, *available at* http://pcaobus.org/Standards/Auditing/Pages/
    AU316.aspx .................................................................................8, 32

AU §§ 316.13-.16 (2010), *available at* http://pcaobus.org/Standards/
    Auditing/Pages/AU316_13.aspx, *and* http://pcaobus.org/Standards/
    Auditing/Pages/AU316_14-45.aspx ...............................................................12

AU § 316.46 (2010), *available at* http://pcaobus.org/Standards/Auditing/
    Pages/AU316_46-50.aspx...........................................................................12

AU § 339 (2004), *available at* http://pcaobus.org/Standards/Auditing/Pages/
    AU339b.aspx ....................................................................................37

AU § 339.01 (2004), *available at* http://pcaobus.org/Standards/Auditing/
    Pages/AU339b.aspx ...........................................................................14, 41

AU § 339.03 (2004), *available at* http://pcaobus.org/Standards/Auditing/
    Pages/AU339b.aspx ...............................................................................41

PCAOB Rule 1001(p)(i), *available at* http://pcaobus.org/Rules/
    PCAOBRules/Pages/Section_1.aspx .................................................................7

PCAOB Rule 3100, *available at* http://pcaobus.org/Rules/PCAOBRules/
    Pages/Section_3.aspx ..............................................................................7

QC 20.03, *available at* http://pcaobus.org/Standards/QC/Pages/QC20.
    aspx ......................................................................................6, 7, 28

## OTHER AUTHORITIES

*Uniform Accountancy Act Model Rules* (July 29, 2011), *available at*
    http://www.aicpa.org/advocacy/state/downloadabledocuments/
    uaamodelrules2011.pdf............................................................................10

DOL, Wage & Hour Div., Report and Recommendations of the Presiding
   Officer *"Executive, Administrative, Professional . . . Outside Salesmen"
   Redefined* (1940), *reproduced at* ECF Dkt. 269-5, No. 1:11-cv-
   00377-CM (S.D.N.Y.) ....................................................................................5

PCAOB, Staff Audit Practice Alert No. 10, *Maintaining and Applying
   Professional Skepticism in Audits* (Dec. 4, 2012), *available at*
   http://pcaobus.org/Standards/QandA/12-04-2012_SAPA_10.pdf ......................8

## COUNTERSTATEMENT OF ISSUES

1.  Whether the district court properly held that KPMG's audit associates are exempt from the overtime requirements of the Fair Labor Standards Act (FLSA) under the Act's "learned professional" exemption.

2.  Whether the district court abused its discretion in denying plaintiffs' motion for additional discovery above and beyond the extensive discovery they had already received, where plaintiffs expressly agreed to the court's bifurcated discovery plan, affirmed the sufficiency of the record by cross-moving for summary judgment, and failed to pursue readily available evidence.

## STATEMENT OF THE CASE

The primary issue presented is whether KPMG's audit associates (Associates) are exempt from the overtime requirements of the FLSA under its "learned professional" exemption.  It is common ground between the parties that Associates are in a career-track position in a recognized learned profession and are paid a salary well above the FLSA's requirement.  Nonetheless, plaintiffs, a group of former Associates, claim that KPMG improperly classified them as exempt.

As the district court correctly recognized in its thorough opinion granting summary judgment to KPMG, plaintiffs' claim fails as a matter of law based on the undisputed material facts.  There is no dispute that accounting is a "field of science or learning" under the regulations.  And there is no dispute that KPMG customarily

requires its Associates to possess the same educational credentials as licensed Certified Public Accountants (CPAs), who are undeniably exempt professionals. Indeed, as the district court observed, all 1,000-plus plaintiffs in this collective action already were eligible to sit for the CPA exam when KPMG hired them.

KPMG requires this rigorous educational background for a reason: Without the advanced accounting knowledge they obtained in college, Associates could not competently perform their jobs. Plaintiffs concede that Associates, no less than the more senior members of KPMG's audit engagement teams, are subject to professional standards that require them to exercise judgment, professional skepticism, and due care throughout their work on audits. Thus, Associates must have a firm grasp of accounting and auditing principles and be able to apply them in varied circumstances as they gather and assess audit evidence, perform audit procedures, and document their conclusions in work papers that provide the principal support for KPMG's audit opinion.

The district court correctly rejected plaintiffs' efforts to portray Associates' work as mindless and routine. Plaintiffs' conclusory assertions that their duties did not require them to use advanced knowledge or to apply discretion and judgment are precisely that—conclusory assertions that cannot be reconciled with the inherently judgmental and discretionary nature of audit work, the applicable professional standards, or KPMG's concededly legitimate expectations as

2

expressed in its job descriptions, training materials, and evaluation criteria.  The record overwhelmingly shows that Associates are learned professionals whose work requires advanced knowledge, discretion, and judgment.  Plaintiffs cannot manufacture an FLSA claim by showing they failed to perform the job for which they were hired.  The decision below is correct and should be affirmed.

## FACTUAL BACKGROUND

### A.    Statutory And Regulatory Background.

#### 1.    The professional exemption under the FLSA.

The FLSA establishes minimum wage and overtime requirements in employment.  29 U.S.C. § 201, *et seq.*  It has exemptions from those requirements, which are "premised on the belief that the workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay."  69 Fed. Reg. 22122, 22124 (Apr. 23, 2004).

Relevant here is the exemption for "employee[s] employed in a bona fide … professional capacity."  29 U.S.C. § 213(a)(1).  Employees are exempt if their salary exceeds a specified threshold (not at issue here), 29 C.F.R. § 541.300(a)(1), and their "primary duty is the performance of work: [1] [r]equiring knowledge of an advanced type [2] in a field of science or learning [3] customarily acquired by a prolonged course of specialized intellectual instruction," *id.* § 541.300(a)(2)(i).

3

Here, only the first and third prongs are at issue.  Br. 27.  "'[W]ork requiring advanced knowledge' means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work."  29 C.F.R. § 541.301(b).  The "phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession."  *Id.* § 541.301(d).

### 2.    The profession of accounting.

In interpreting the FLSA exemptions, the Supreme Court has explained that "[t]he statute's emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than formal, inquiry, one that views an employee's responsibilities *in the context of the particular industry in which the employee works*."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2170 (2012) (emphasis added).  The FLSA regulations expressly provide that "accounting" is a "'field of science or learning.'"  29 C.F.R. § 541.301(c).  They add that "[c]ertified public accountants generally meet the duties requirements for the learned professional exemption," and that "many other accountants who are not certified public accountants but perform similar job duties may qualify as exempt learned professionals."  *Id.* § 541.301(e)(5).  Since 1940, the Department of Labor (DOL)

4

has recognized that "entrants into accounting firms [must] be persons with a thorough training in the principles and practices of accountancy as given in some recognized institution of learning."  DOL, Wage & Hour Div., Report and Recommendations of the Presiding Officer *"Executive, Administrative, Professional … Outside Salesmen" Redefined* 35 (1940).  KPMG always has classified its Associates as learned professionals exempt from overtime under the FLSA.  SPA-50-51; JA-1683-1684; JA-1628-1629 (¶370).

Audits are an important part of ensuring the integrity of financial reporting. Public and private companies prepare financial statements in accordance with Generally Accepted Accounting Principles (GAAP), the authoritative accounting standards.  *See Wyly v. Weiss*, 697 F.3d 131, 134 n.4 (2d Cir. 2012).  Independent auditors like KPMG opine, based on audits conducted in accordance with professional standards, on whether those financial statements conform to GAAP. JA-649-650 (¶¶2-2b).  For certain public companies, an independent auditor may also opine on the effectiveness of the client's internal controls over financial reporting.  *Id.*  The Supreme Court has recognized that this work is critical to the nation's financial markets:

> The SEC requires the filing of audited financial statements in order to obviate the fear of loss from reliance on inaccurate information, thereby encouraging public investment in the Nation's industries.  It is therefore not enough that financial statements *be* accurate; the public must also *perceive* them as being accurate.  Public faith in the reliability of a corporation's

financial statements depends upon the public perception of the outside auditor as an independent professional.

*United States v. Arthur Young & Co.*, 465 U.S. 805, 819 n.15 (1984).

Moreover, the accounting profession is highly regulated. As the Supreme Court recently detailed, through the Sarbanes-Oxley Act, Congress imposed "tighter regulation of the accounting industry under a new Public Company Accounting Oversight Board" (PCAOB). *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3147 (2010). The PCAOB has "expansive powers to govern an entire industry," and "[e]very accounting firm … must … comply with its rules and oversight." *Id.* The PCAOB has adopted the Statement on Quality Control Standards issued by the Auditing Standard Board (ASB), the senior technical body of the American Institute of Certified Public Accountants (AICPA). It requires a firm to "ensure that its personnel comply with the professional standards applicable to its accounting and audit practice." QC 20.03 (footnote omitted).[1]

---

[1] For private companies, the applicable auditing standards are the Generally Accepted Auditing Standards (GAAS). The ASB promulgates Statements on Auditing Standards that are codified in GAAS as "AU" sections. For public companies, the PCAOB's Auditing Standards, cited as "AS" sections, apply. In April 2003, the PCAOB adopted GAAS and codified the AU sections (with additions and modifications), as AS sections applicable to public companies. The PCAOB has adopted certain of the ASB's Quality Control Standards as of April 16, 2003, codifying them with additions and modifications as "QC" sections. GAAS and PCAOB standards now are the embodiment of professional audit standards.

6

The basic professional standards include three general standards, three standards of field work, and four standards of reporting.  AU § 150.02.  They apply to each member of an audit engagement team, whether licensed or unlicensed.  *See generally Free Enter. Fund*, 130 S. Ct. at 3147-48.[2]  The standards require and reinforce the need for technical competence, independence, discretion, and judgment in conducting audits.  AU § 150.02.

Exercising judgment is a core responsibility for every member of an engagement team throughout the audit.  *See*, *e.g.*, AS No. 9 (planning stages); AS No. 3 (documenting work).  Notably, judgment must be exercised when applying the standards of field work, *i.e.*, work generally done at the client's location.  For example, the field work standards require that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU § 150.02 (2010).

Fundamental to the exercise of judgment when obtaining competent evidence to support an opinion is the duty "to exercise professional skepticism,"

---

[2] *See* AS No. 10 ("[e]ngagement team members who assist" must comply with standards); AS No. 9 ¶4 n.2 (same); AU § 230.02 ("[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization"); AU § 311.12 (2010) ("assistants" and individuals with "final responsibility" must meet standards); PCAOB Rule 1001(p)(i) & Rule 3100 (firm and associated persons); QC 20.03 & n.4 (firm must ensure that all personnel—*i.e.*, "all individuals who perform professional services for which the firm is responsible, whether or not they are CPAs"—comply with standards).

which is "an attitude that includes a questioning mind and a critical assessment of audit evidence." *Id.* § 230.07.  Just days after the entry of summary judgment here, the PCAOB emphasized that "*each individual auditor*" must "appropriately apply professional skepticism throughout the audit, including in identifying and assessing the risks of material misstatement, performing tests of controls and substantive procedures to respond to the risks, and evaluating the results of the audit." PCAOB, Staff Audit Practice Alert No. 10, *Maintaining and Applying Professional Skepticism in Audits* 2 (Dec. 4, 2012) (emphasis added).

Finally, each team member must exercise "[d]ue professional care" throughout the audit.  AU § 150.02; *see also id.* § 230.02 (imposing obligations "upon each professional within an independent auditor's organization").  The standards reiterate that "[d]ue professional care requires the auditor to exercise professional skepticism," which "requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred." *Id.* § 316.13.

### B.    Factual Background.

#### 1.    KPMG's audit practice.

KPMG provides audit, tax, and advisory services to public and private clients in the United States.  As of June 2012, KPMG's audit practice employed

approximately 6,700 audit professionals, about 2,500 of whom held the title of Associate. JA-703 (¶7).

KPMG's audits are conducted by engagement teams, typically including one or more partners, senior managers, managers, senior associates, and Associates. SPA-6. While Associates are the most junior team members, it is a career-track position with opportunities to advance through the ranks to partner. *Id*. To satisfy quality control standards, KPMG has adopted hiring, training, and job performance polices that provide reasonable assurance that all auditors, including Associates, comply with the professional standards. JA-710-711 (¶32).

### 2.    KPMG's hiring criteria.

KPMG hires Associates who have specialized knowledge necessary to comply with the professional standards, including the requirement that each audit team member possess technical proficiency in accounting and the ability to exercise professional judgment and due care. JA-710-711 (¶¶31-32); JA-765-766. KPMG requires its Associates to possess an "'[u]nderstanding and knowledge of testing both the design and effectiveness of internal controls,'" and a "'[s]trong understanding of US GAAP, US GAAS, and preferably, PCAOB auditing standards.'" SPA-8 (quoting record).[3]

---

[3] *See* JA-711-713 (¶¶36, 41); JA-748; JA-752; JA-754; JA-756; JA-763-764.

KPMG also requires its incoming Associates to have completed a course of study at a college or university that makes them eligible to become licensed as CPAs in their home states.  SPA-7; JA-2040 (¶20); *see* JA-711 (¶34), JA-748; JA-752; JA-763-764; JA-1678-1679.  KPMG occasionally has hired Associates who are not CPA-eligible, but only when the recruit has satisfied nearly all of the educational requirements to be CPA-eligible and there is a specific plan to become CPA-eligible in short order.  SPA-7; JA-711 (¶34).  Every plaintiff here was CPA-eligible when hired, SPA-34, several were CPAs when they started at KPMG, and many more obtained their licenses while at KPMG.  *See* JA-1377 (¶¶3-4) & JA-1379-1385; JA-1660-1661 (¶18) & JA-1727-1735.  While the educational requirements for CPA-eligibility vary by state, nearly all states require a Bachelor's degree with an accounting concentration or the equivalent, with at least 150 semester hours of college-level education.  SPA-7; *see* JA-711 (¶34); JA-2193-2194 (¶29).  Most states require at least 24 semester hours of accounting courses and 24 semester hours of business courses, as required by the National Association of State Boards of Accountancy's (NASBA) Uniform Accountancy Act Model Rules.  JA-2193-2194 (¶¶29-30).[4]

Consistent with KPMG's rigorous hiring standards, plaintiffs concede that the "vast majority of Audit Associates had accounting degrees and were eligible to

---

[4] *See also* Landau Decl. (Dkt.269), Ex. D; *Uniform Accountancy Act Model Rules*, R. 5-2(d)(2) and (4) (July 29, 2011) (listing qualifying courses).

take the CPA exam." Br. 46 n.6. Approximately 40% of incoming Associates also had graduate degrees in accounting or other relevant fields. SPA-8.

### 3. KPMG's training.

To comply with quality control standards, KPMG provides training to its audit professionals through continuing professional education courses on a variety of audit and accounting topics, beginning at the start of their employment and continuing throughout their tenure at the Firm. SPA-9-10; *see* JA-689 (¶5). KPMG's training helps its audit professionals comply with the myriad professional standards in performing audit work. JA-689 (¶6).

KPMG requires incoming Associates to attend "Audit Fundamentals," a week-long, in-person course. SPA-9. Audit Fundamentals introduces new Associates to KPMG's audit methodology and trains them on how to apply the advanced knowledge they already possess in simulations of situations they are likely to encounter in the field during their first year at KPMG. JA-689-690 (¶7(a)); JA-783, JA-788, SA-497-498, SA-500-501. Audit Fundamentals repeatedly emphasizes every Associate's obligation to comply with professional standards and to exercise sound professional judgment in performing audit procedures. JA-692-694 (¶¶9, 9(a), 9(c)); JA-789-791, SA-505-506; SA-81.

11

### 4.    The role of Associates.

Associates' primary duty is to perform audit work in accordance with

KPMG's audit methodology and professional standards.  SPA-10; JA-2221 (¶49).

In doing so, Associates function as integral members of engagement teams,

performing audit work that enables KPMG to issue an audit opinion.  SPA-5; JA-

712 (¶40).  Associates are responsible for "performing much of the audit fieldwork

on site at the client's location, which includes testing internal controls and

inventory observations."  SPA-13.  At times, they may be the only member of the

engagement team present.  *Id.*; JA-2317.

Associates must perform all work in accordance with professional standards,

including the exercise of judgment, professional skepticism, and due care.  SPA-

10, 24.[5]  They are expected to use their knowledge of accounting and of the client's

business to identify unusual transactions or other circumstances suggesting that

further investigation is appropriate or that KPMG should consider modifying the

planned audit procedures based on new information.  JA-718 (¶61); *see also* AU

§§ 316.13-316.16, 316.02, 316.46 (2010).  Although responsibilities vary

depending on the circumstances of the engagement, Associates' work includes:

**Performing procedures to test clients' internal controls over financial**

**reporting.**  SPA-13-15.  These procedures include interviews of client

---

[5] *See* JA-712-713 (¶¶41, 49); JA-724, 731, 733; JA-739, 743, 745; JA-747; JA-751; JA-776.

representatives (walkthroughs), in which the Associate reviews the client's documentation of its internal controls, asks the client representative questions to understand how the client follows those controls, and compares the responses to the client's documentation. *See id.*; *see also* SA-178-339. During the walkthroughs, Associates are expected to "'integrate, filter, and summarize key points,'" "'modify questions quickly when necessary,'" "'draw conclusions,'" "'note and interpret body language,'" "'probe on inconsistencies,'" and "'determine sufficiency of audit evidence.'" JA-715 (¶51); JA-733; JA-745; JA-768-773.

**Performing substantive analytical procedures and tests of details.** SPA-16-17. Associates are expected to "'investigate/analyze relationships,'" "'describe not just what happened but why,'" "'[i]dentify key factors, key relationships and other considerations that drive the business,'" "'[s]et and corroborate expectations,'" and "'[c]ompare actual amounts to our expectations and evaluate results.'" They also must "'[k]now how to determine appropriate audit sampling technique'" and "'[d]etermine if audit evidence is sufficient and appropriate for tests performed.'" JA-715-716 (¶52) (alterations in original); JA-724, 728; JA-739, 740.

**Documenting results of audit procedures in work papers.** SPA-17-20. "The preparation of these work papers is critically important to the audit process

13

because audit documentation, as outlined by professional standards, '[p]rovides the principal support for the representation in the auditor's report that the auditor performed the audit in accordance with [GAAS]' and '[p]rovides the principal support for the opinion.'"  SPA-19 (second alteration in original) (quoting, *inter alia*, AU § 339.03); *see also*, *e.g.*, JA-716 (¶53).  The professional standards require Associates to "exercise [their] professional judgment" to determine what information should be included in work papers.  AU § 339.01 (2004); *accord* AS No. 3.

**"Conducting research" and "documenting the issues and their conclusions in a work paper."**  SPA-18.  Associates must "'identify accounting or auditing issues relevant to assigned audit tasks that may require independent research,'" and "'communicate authoritative literature clearly and accurately.'" JA-716 (¶54); JA-723; JA-738; JA-747; JA-751; *see also* JA-774.

**C.    Proceedings Below.**

Plaintiffs Pippins and Schindler filed this action on January 19, 2011, asserting a claim for unpaid overtime under the FLSA on behalf of a proposed nationwide collective of Associates.  JA-257 (Dkt.1).  They amended their complaint on April 25, 2011, to add plaintiff Lambert and to assert putative class action claims under New York labor law.  JA-263 (Dkt.51).

14

On January 3, 2012, the district court conditionally certified a nationwide FLSA collective.  JA-559-587.  The court bifurcated discovery and ordered the parties, following the close of the first phase of discovery, to file summary judgment motions on the issue of whether "*all* Audit Associates are … professionals" exempt from the FLSA's overtime requirements.  JA-585.

During a March 2, 2012 discovery conference, the court explained that because the question whether all Associates are exempt was potentially dispositive, the action could be most efficiently litigated by limited discovery followed by motions for summary judgment.  JA-612-615.  Plaintiffs' counsel "agree[d] that this case should be litigated the way the court is contemplating."  JA-614; *see also* JA-608 (noting that they "like[d]" the court's structure).  Following the conference, the parties jointly submitted and the court entered an order establishing deadlines for the first discovery phase.  JA-284-285 (Dkt.197).

Before the deadline, KPMG produced an enormous volume of information regarding the exempt status of Associates.  KPMG's production contained nearly 300,000 pages, and included manuals, documents regarding firm-wide compensation and other policies, training materials, job description and evaluation documents, and emails and other electronic documents from eleven corporate custodians.  JA-2147-2148 (¶¶5-6).  Because plaintiffs never noticed any

individual depositions, their deposition discovery was limited to the three Rule 30(b)(6) witnesses KPMG designated.

On April 27, 2012, just before the close of the first discovery phase, plaintiffs moved to compel additional discovery.  Within days, the parties agreed to, and the magistrate judge ordered, the deferral of specified categories of discovery to the "Further Discovery Period," which would occur only "if the Court has not granted summary judgment disposing of all claims in the case."  JA-621.

On May 3, 2012, the magistrate judge conducted a hearing on the remaining issues related to plaintiffs' motion to compel, during which plaintiffs again agreed to defer certain of their requests until after the summary judgment motions.  JA-636.  The magistrate judge granted plaintiffs' request for contact information for a limited number of KPMG supervisors.  JA-629, 647.  KPMG complied.

On June 8, 2012, plaintiffs and KPMG cross-moved for summary judgment. JA-294-296 (Dkt.264-273).  Plaintiffs sought partial summary judgment on the professional exemption as to first-year Associates and summary judgment on the administrative exemption as to all Associates.  JA-295 (Dkt.270).  KPMG moved for summary judgment on the professional exemption.  JA-294 (Dkt.264). Plaintiffs opposed KPMG's motion and also moved, in the alternative, for additional discovery under Federal Rule of Civil Procedure 56(d).  JA-297

16

(Dkt.288-290).  On October 10, 2012, the court denied plaintiffs' Rule 56(d) motion.  JA-303 (Dkt.345).

On November 30, 2012, the district court issued a published opinion and order (921 F. Supp. 2d 26) granting KPMG's summary judgment motion, denying plaintiffs' cross-motion, dismissing plaintiffs' FLSA claims with prejudice, and dismissing plaintiffs' state-law claims without prejudice.  SPA-4, 52.  In a lengthy, well-reasoned decision, the court held that KPMG's Associates are exempt professionals.  SPA-52.  This appeal followed.

## SUMMARY OF ARGUMENT

I.  The district court correctly held that KPMG's Associates are learned professionals exempt from the FLSA's overtime requirements.  The exemption applies when employees' "primary duty" is work "[1] [r]equiring knowledge of an advanced type [2] in a field of science or learning [3] customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.300(a).  The regulations state that accounting is a "field of science or learning," *id.*, and the undisputed material facts show the other two requirements are met.

*First*, there is no question that KPMG requires its incoming Associates to have advanced knowledge in accounting that is acquired through a prolonged course of specialized instruction.  The district court correctly recognized that a specific college degree or major is not necessary to satisfy the requirement that

17

employees "customarily acquire" their "advanced knowledge" through "a prolonged course of specialized intellectual study."  Moreover, the court properly held that KPMG's Associates satisfied that requirement.  The 1,000-plus plaintiffs here were CPA-eligible or had CPA licenses when hired, and CPA-eligibility does not mandate a specific degree, but rather requires only a Bachelor's degree with a concentration in accounting or its equivalent.  The academic degree and the specialized course of study required to become CPA-eligible far exceed what the federal appeals courts have found sufficient in other learned professions.

Although plaintiffs emphasize that KPMG does not require Associates to have an accounting *degree*, the FLSA does not impose any degree-specific requirement.  Regardless, plaintiffs concede that "the vast majority of Audit Associates had accounting degrees and were eligible to take the CPA exam." Given that the FLSA requires only that employees "customarily acquire" their knowledge through a prolonged course of specialized study, the undisputed fact that the vast majority of Associates do so is conclusive.  There is no merit to plaintiffs' contention that Associates obtain their knowledge through KPMG's training, not their academic study.  Without the educational background that Associates possess when they start at KPMG, they would not be able to understand KPMG's training, which teaches them how to *apply in practice* the accounting principles they learned in school.

18

*Second*, the district court rightly held that Associates' primary duty is work requiring application of their advanced knowledge.  Associates' core function is to perform audit work that comports with professional standards and KPMG's audit methodology.  The professional standards require Associates to exercise judgment, professional skepticism, and due care in every aspect of their work on an audit.  In gathering audit evidence, assessing its competency and sufficiency, performing audit procedures, and documenting their conclusions in work papers, Associates consistently exercise judgment and discretion using their advanced accounting knowledge.  They make judgments and create work product that more senior members of the team rely upon and that forms the evidentiary basis for the audit opinions that KPMG issues.  The district court correctly held that plaintiffs' conclusory assertions demeaning the nature and importance of their own work—which are contradicted by their own résumés and sworn submissions to state licensing boards—create no genuine issue of material fact.

II.  There is no merit to plaintiffs' suggestion that the court abused its discretion in limiting discovery or denying their Rule 56(d) motion.  Plaintiffs' arguments are not credible given that they (1) expressly consented to, and indeed applauded, the court's bifurcated discovery plan that they now challenge on appeal, (2) agreed to defer until after summary judgment motions additional discovery that they now contend should have been produced, and (3) cross-moved for summary

19

judgment on the same exemption issues which they belatedly contend required a

fuller evidentiary record.  Were that not enough to sustain the court's exercise of

its broad discretion—and it is—plaintiffs already had obtained reams of discovery,

taken extensive depositions, and declined to pursue other available discovery.

## ARGUMENT

## I.   THE DISTRICT COURT PROPERLY RULED THAT KPMG'S ASSOCIATES ARE EXEMPT PROFESSIONALS.

### A.   Associates Possess Advanced Knowledge That Is "Customarily Acquired By A Prolonged Course Of Specialized Instruction."

The district court correctly concluded that KPMG's Associates have

advanced knowledge that is "customarily acquired by a prolonged course of

specialized intellectual instruction."  29 C.F.R. § 541.301(a)(3); *see* SPA-31-34.

The higher education through which KPMG's Associates customarily acquire their

advanced knowledge easily satisfies this requirement.

"The phrase 'customarily acquired by a prolonged course of specialized

intellectual instruction' restricts the exemption to professions where specialized

academic training is a standard prerequisite for entrance into the profession.  The

best prima facie evidence that an employee meets this requirement is possession of

the appropriate academic degree."  29 C.F.R. § 541.301(d).  The requisite

knowledge "cannot be attained at the high school level."  *Id.* § 541.301(b).

"[O]ccupations that customarily may be performed with only the general

20

knowledge acquired by an academic degree in any field" do not satisfy the requirement.  *Id.* § 541.301(d).  *See also* 69 Fed. Reg. at 22150-51.

The circuits widely hold that the professional exemption applies when "applicants are required to complete a particular course of instruction directly related to a position, even if they do not have a specific degree."  *Solis v. Washington*, 656 F.3d 1079, 1085 (9th Cir. 2011) (collecting cases).[6]  For instance, the Sixth Circuit held that a licensed funeral director was exempt because licensure required one year of mortuary instruction and two years of college, with classes in chemistry and psychology.  *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 742 (6th Cir. 2000).  Likewise, the Seventh Circuit held that the exemption applied to an actuary who majored in mathematics and took business coursework in earning his bachelor of science.  *Piscione v. Ernst & Young LLP*, 171 F.3d 527, 544-45 (7th Cir. 1999), *overruled in part on other grounds*, *Hill v. Tangherlini*, 2013 WL 3942935 (7th Cir. Aug. 1, 2013).  And even though their position required only a bachelor's degree in any field, the Fifth Circuit held that state-licensed athletic trainers were exempt because they had to take courses in a variety of health- and fitness-related subjects.  *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 524-25 (5th Cir. 1999); *see also Reich v. Wyoming*, 993 F.2d 739, 742-43 (10th

---

[6] In this Court's only treatment of the specialized education prong, the exemption was not satisfied because it was "uncontested that the job … require[d] no formal advanced education."  *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 205 (2d Cir. 2009); *see* SPA-32 (recognizing Second Circuit law is sparse).

21

Cir. 1993) (exemption applied to game wardens who were required to have a bachelor's degree in wildlife management, wildlife biology, or a closely related field, as well as basic law enforcement training).

KPMG's Associates customarily acquire their advanced knowledge through prolonged and specialized study. Their academic background is not akin to the generalized study that anyone with a Baccalaureate undergoes. *See* SPA-7, 33.

### 1. Associates have CPAs or are CPA-eligible, for which a prolonged course of specialized study is a prerequisite.

Plaintiffs recognized that KPMG "focuses" on recruiting Associates from "top accounting programs" and designs its hiring standards to satisfy professional standards. JA-2042-2043 (¶¶25-26). Plaintiffs also admitted that KPMG "requires Audit Associates to be CPA-eligible or near CPA-eligible." JA-2040 (¶20); SPA-7; *see supra*, 9-11.

These concessions are significant because CPA-eligibility hinges upon completion of a defined and rigorous course of study. While each state sets its own requirements for CPA-eligibility, "nearly all states require that an individual hold a baccalaureate degree with an accounting concentration or its equivalent, within a total course of study of at least 150 semester hours, which is generally longer than a standard four-year program." SPA-7; *supra*, 10. The vast majority of states require at least 24 semester hours in accounting and at least 24 more semester hours in business courses, consistent with NASBA's Model Rules. JA-

2193-2194 (¶¶29-30); *supra*, 10.  Many states' requirements exceed these already

substantial *minima*.  For example, New York (where plaintiff Lambert became

licensed) requires 33 semester hours of accounting courses and 36 semester hours

of general business courses.  *See* SPA-7.

  These educational requirements ensure that KPMG's Associates possess

strong "knowledge of accounting standards, including U.S. GAAP, U.S. GAAS,

and PCAOB auditing standards" that will be critical to their practice.  SPA-9; JA-

552-555 (¶¶89-97) (describing college accounting curricula); JA-711-712 (¶36);

JA-763-764; *see also* JA-663-664 (¶35) (quoting job postings).

  The foregoing specialized educational requirements—which are directly

relevant to Associates' performance of their primary duties, *see infra*, § I.B—equal

or far exceed those the courts and DOL have found sufficient.  *See supra*, 21-22

(collecting cases).  Indeed, KPMG's Associates have the same educational

background as licensed CPAs.  *See* SPA-33.  CPAs are recognized exempt

professionals.  *See* 29 C.F.R. § 541.301(e)(5) (CPAs and unlicensed accountants

performing similar work are exempt); *supra*, 4-5; *Bell v. Callaway Partners, LLC*,

394 F. App'x 632, 634 (11th Cir. 2010) ("highly-educated accountants and

[CPAs]" satisfied the exemption).

## 2. The exemption applies notwithstanding that KPMG occasionally has hired not yet CPA-eligible Associates.

KPMG's acknowledgement that it has occasionally hired non-CPA-eligible Associates does not defeat the exemption. SPA-34; *see* Br. 46-47. Rather, advanced knowledge need only be "*customarily*" acquired through a prolonged course of intellectual instruction. 29 C.F.R. § 541.301(a)(3) (emphasis added). "The word 'customarily' is key." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 205 (2d Cir. 2004).

There is no question that Associates customarily acquire their knowledge through the specialized intellectual instruction discussed above. Plaintiffs concede that the "*vast majority* of Audit Associates had accounting degrees and were eligible to take the CPA exam." Br. 46 n.6 (emphasis added). That alone is a sufficient basis to affirm the court's holding that the specialized education requirement is satisfied. Regardless, the record unequivocally shows that KPMG hires Associates who are not CPA-eligible only "[a]s long as we have a clear plan that they're going to become CPA eligible." JA-1667; *see* JA-1671-1672; JA-764. Moreover, *all* 1,000-plus plaintiffs were CPA-eligible or licensed when hired. SPA-34. Approximately 82% already had accounting degrees, 14% had undergraduate or graduate degrees in business, finance, or economics, and the remaining 46 plaintiffs were CPA-eligible or had licenses. *Id.*

24

Lead plaintiffs are illustrative.  For example, Mr. Pippins received a B.B.A.
degree in Accounting.  JA-1697-1698.  Ms. Schindler received bachelor's and
master's degrees in accounting before starting at KPMG, and became a CPA
months later.  JA-1701-1702; JA-382-383.  Mr. Lambert completed an M.S. in
Accounting and Financial Management before joining KPMG.  JA-380-381; JA-
384-386.

Plaintiffs do not contradict this evidence.  *See* Br. 46-47.  *First*, plaintiffs
suggest that the educational requirement is not satisfied because Associates "do not
need a CPA license."  Br. 46.  Plaintiffs do not and cannot cite any law to support
the proposition that a license is required.  To the contrary, the regulations expressly
permit "accountants who are not [CPAs]" to "qualify as exempt learned
professionals."  29 C.F.R. § 541.301(e)(5).

*Second*, plaintiffs claim that KPMG's willingness "to hire even one Audit
Associate who did not have an accounting degree supports an inference that an
accounting degree was not required to do Audit Associate work."  Br. 47.  That
argument is irreconcilable with § 541.301's focus on how employees
"customarily" (not *always*) acquire their advanced knowledge.  Moreover, there is
no basis for treating an accounting degree as mandatory.  Many of the nation's
finest colleges and universities do not offer an accounting *degree*, CPA-eligibility
does not require an accounting degree, and many licensed CPAs do not have such

25

degrees.  The rule for which plaintiffs advocate also is irreconcilable with circuit

law nationwide.  *Supra*, 21-22.  The relevant distinction, as shown, is between

employees who merely have had a generalized course of undergraduate study and

those who have completed prolonged specialized studies, including accounting-

focused collegiate curricula.[7]

### 3. Neither KPMG's training nor Associates' on-the-job experience vitiate the advanced knowledge Associates need and already possess when they are hired.

In tension with their efforts to downplay the advanced knowledge that their

primary job duties require, *see infra*, § I.B, plaintiffs argue that the rigor of

KPMG's Audit Fundamentals training demonstrates that Associates do not acquire

advanced knowledge through higher education.  Br. 7-9, 47-49.  Plaintiffs'

argument is baseless.

KPMG's training is not a substitute for Associates' "hours and hours" of

focused college coursework, nor could it be—it is only "a nanosecond compared to

the advanced knowledge that they're walking into the firm with."  JA-793.

KPMG's guidance and training are predicated on the fact that Associates come to

the firm with advanced knowledge of accounting and auditing standards.  JA-709

---

[7] The lone case plaintiffs cite is consistent with these principles.  Br. 47.  In
*Kadden v. VisuaLex, LLC*, 910 F. Supp. 2d 523 (S.D.N.Y. 2012), the court
recognized that "'[c]ustomarily' in this context makes the exemption applicable to
the rare individual who, *unlike the vast majority of others* in the profession, lacks
the formal educational training and degree."  *Id.* at 534 n.94 (emphasis added).

(¶28), 711-712 (¶36).  Associates' specialized higher education is the baseline for

being able to understand the training and to properly perform their work.  JA-711-

712 (¶36); JA-781-783, 786-787; JA-691 (¶8); JA-1665-1666, 1668-1669; JA-763-

764 (specialized education "provides the foundational knowledge"); SPA-9.  The

training materials are laden with technical language, and they require an

understanding of complex concepts in accounting and auditing.  *See*, *e.g.*, SA-150

("COSO control framework" and "statutory audits"); SA-362 (discussing "cash

confirmations," "bank reconciliation test of details," "financial statements

assertions tested over cash"); *infra*, § I.B.2 (discussing training's relationship to

Associates' primary duties).[8]

KPMG's training is the "bridge between the college experience," where

auditing and accounting are learned, and the practice of public accounting.  JA-

---

[8] Plaintiffs rely on their formulaic declarations that KPMG's training "did not require people to have any preexisting knowledge of accounting or finance."  *E.g.*, JA-345 (¶29).  But plaintiffs cannot manufacture a genuine issue of material fact through these conclusory assertions.  The training materials submitted to the district court speak for themselves, and conclusively refute any suggestion that someone without a background in accounting, finance, or business could perform an Associate's job at all, much less at a level demanded by professional standards.  Moreover, plaintiffs each *had* preexisting advanced knowledge and thus are in no position to judge whether someone *without* such an educational background could understand and apply the concepts covered in Audit Fundamentals.  Their testimony is therefore entitled to no weight.  *See* Fed. R. Civ. P. 56(c)(4).

27

783.[9]  KPMG's Audit Fundamentals training provides "just a refresher" on

principles of accounting and auditing, JA-793, then turns to "how to apply" those

principles in practice, JA-783.  The training focuses on "a series of audit

simulations of real-life situations [Associates] are likely to encounter in the field."

JA-2201 (¶39a).  This makes sense because individuals with strong backgrounds in

accounting and auditing principles nonetheless need guidance in *applying those*

*principles in the real world*.  *See* SA-1123-1124; JA-1676-1677.

    Such practical training is vital here because Associates must utilize KPMG's

proprietary auditing methods.  Plaintiffs acknowledge that the training is directed

at "*KPMG's* audit methodology and the procedures [Associates] are likely to

perform."  Br. 8 (emphasis added).  The training's "goal" is to have Associates

"apply auditing standards and accounting standards *and KPMG methodology*

effectively to the clients they serve."  JA-784-785; *see* JA-786.  Training in

KPMG's methodology is essential because Associates are "expected to

understand … what our policies are and carry out those policies."  JA-1664.

Moreover, doing so is *mandatory* under the professional standards, which require

that personnel comply with "*the firm's* standards of quality."  QC 20.03 (emphasis

added).

---

[9] Plaintiffs cite, without quoting, this testimony, wrongly claiming that it shows
KPMG's training "does not require pre-existing advanced accounting knowledge."
Br. 7-8.  The evidence is to the contrary.  *Supra*, 26-28; *infra*, § I.B.2.

Accordingly, this Court should reject plaintiffs' argument that the specialized knowledge requirement is defeated because KPMG provides training. Instead, consistent with other courts' holdings, it should recognize that post-employment training, particularly in the form of continuing professional education, reinforces the idea that an employee is an exempt professional. *See*, *e.g.*, *Piscione*, 171 F.3d at 544 (holding that Ernst & Young's required post-employment continuing education helped employee stay abreast of changes and "'contributed to [plaintiff's] professional development'"); *Stevins v. Provident Const. Co.*, 137 F. App'x 198, 199 & n.2 (11th Cir. 2005) (relying on continuing education related to builder's license); *Reich*, 993 F.2d at 741 (relying on requirement that employees had to have 40 hours of law enforcement training every two years); *Mudgett v. Univ. of Pittsburgh Med. Ctr.*, No. 09-254, 2010 WL 1838413, at *8 (W.D. Pa. May 6, 2010) ("The fact that the details of procedures and routines of a particular working environment … may need to be learned on the job … does not make superfluous the underlying knowledge and skills which initially qualified the person for the position and which she continues to apply in that new work environment."). It should come as no surprise, nevermind defeat the professional exemption, that employers often require employees to have *both* a specialized educational background before they begin working *and* supplemental training that

29

allows them to succeed and develop both in the profession and with that particular employer.  *See Piscione*, 171 F.3d at 544.[10]

Finally, that senior associates may assist and supervise Associates does not trump the fact that Associates acquired advanced knowledge through their specialized educations.  Br. 48-49, 8.  Consistent with any hierarchical profession, it is insignificant and natural that KPMG's Associates hone their skills through oversight and guidance from their superiors.  Plaintiffs do not and cannot point to any law suggesting that the specialized education prong fails where employees learn from their superiors in this manner.  *See In re KPMG Wage & Hour Litig.*, No. 07-4396, 2012 WL 5416939, at *6 (C.D. Cal. Oct. 19, 2012) (rejecting argument that plaintiff "learned everything that she needed to know to perform audit work through KPMG's training programs and on-the-job training," and holding that her education satisfied the requirement).

---

[10] Plaintiffs argue that Associates' lack of advanced knowledge when hired is shown because KPMG's training (formerly) began with "basic audit concepts." Br. 8.  That not only is wrong generally, it is misleading given the context that plaintiffs ignore.  These "basic concepts" were discussed during a *one-hour* module within a two-week course designed "to refresh our participants' knowledge" on material they learned in college.  SA-1125-1126; *see* SA-1126-1127, JA-1689-1690.  That module has not been used in Audit Fundamentals training since 2007 because KPMG's new hires already "have a tremendous amount of advanced knowledge from college" on that topic.  SA-1127-1128.  Regardless, re-introducing concepts for one hour is itself innocuous, but is even more so here because Associates are beginning what is typically their first post-collegiate work experience.  *See*, *e.g.*, JA-387-388; SA-1122, 1129.  The training materials acknowledge that Associates "will no doubt be feeling nervous and apprehensive."  SA-15.

30

### B.    Associates' Primary Duty Requires Advanced Knowledge.

#### 1.    Associates' primary duty is to perform audit work in accordance with professional standards.

The district court also correctly held that Associates' "primary duty" is the performance of exempt work.  SPA-34-52.  An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs," and is determined based on "the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  The regulations "'call for a holistic approach to determining an employee's primary duty,' not 'day-by-day scrutiny of the [employee's] tasks.'" 69 Fed. Reg. at 22186.  The central issue is which responsibilities are "most important or critical to the success of the [employer]."  *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982).  As the district court held, and as plaintiffs argued below, all Associates have the same "primary duty."  *See* JA-591, 606-608 (plaintiffs arguing that Associates' "primary duty" "is not an individualized determination" because it depends on "what is the most important aspect of this person's job to the company"); *see also* JA-646 (plaintiffs arguing that "primary duty" inquiry is conducted on a "job title"-wide basis).

In determining an employee's primary duty, the amount of time spent performing exempt work "can be a useful guide," but it is not determinative.  29 C.F.R. § 541.700(b).  "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," but

31

"nothing in [the regulations] requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if other factors support such a conclusion." *Id.* "Federal courts have found many employees exempt who spent less than 50 percent of their time performing exempt work." 69 Fed. Reg. at 22186; *see*, *e.g.*, *Rutlin*, 220 F.3d at 742; *Reich*, 993 F.2d at 742. This principle has particular force here, because the professional standards require Associates to exercise professional skepticism in all aspects of their audit work, which "requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred." AU § 316.13.

In addition, "an employee's primary duty can encompass multiple tasks," 69 Fed. Reg. at 22186, and "[w]ork that is 'directly and closely related' to the performance of exempt work is also considered exempt work," 29 C.F.R. § 541.703(a). A task is "directly and closely related" to exempt work if it is "related to exempt duties" and "contribute[s] to or facilitate[s] performance of exempt work." *Id.* Such tasks "may include physical tasks and menial tasks that arise out of exempt duties" and other "routine work." *Id.* For example, "recordkeeping," "taking notes," "using the computer to create documents or presentations," and "using a photocopier or fax machine" all may qualify as

32

exempt work if these activities are directly and closely related to the performance of exempt duties. *Id.*

Here, it is undisputed that plaintiffs' primary duty as Associates was to perform audit work in accordance with KPMG's proprietary audit methodology and professional standards. JA-2221 (¶49); SPA-35 ("it is undisputed that the *primary* duties of Audit Associates involve performing the various tasks that are associated with performing audits—not doing clerical chores"). Plaintiffs do not dispute that they spent their working time performing the various audit procedures described in KPMG's training materials, and they concede that in performing those duties they were subject to professional standards, including the obligation to exercise judgment, professional skepticism, and due care. JA-2177-2178 (¶16), 2186-2187 (¶21); *see* JA-705-709 (¶¶14-29).

Accordingly, the only issue is whether performing these audit procedures is exempt work within the meaning of the regulations. That issue is appropriate for summary judgment because, while "'[t]he question of how the employees spent their working time is a question of fact,'" the "'question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (alteration and omission omitted) (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). Where, as here, the duties performed are not in

33

dispute, and the only issue is how to characterize them, courts have not hesitated to grant summary judgment to employers despite plaintiffs' attempts to characterize their work as routine and mechanical. *See*, *e.g.*, *De Jesús-Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72, 74-77 (1st Cir. 2005); *Rutlin*, 220 F.3d at 742-43; *Owsley*, 187 F.3d at 525-27; *Piscione*, 171 F.3d at 543-46.

### 2. Associates could not perform their primary duty without the advanced knowledge they obtained in college.

Associates' primary duty requires them to apply the advanced knowledge they acquired through the specialized coursework that made them CPA-eligible. To fulfill their primary duty, Associates must know and be able to apply accounting principles such as general revenue recognition concepts, general lease recognition concepts, income tax concepts, and fair value concepts. JA-725. They must also have extensive knowledge of auditing standards, including a thorough understanding of financial statement assertions, audit risks, and appropriate responses to identified risks. JA-726-729; JA-746-748.

As discussed *supra*, 26-28, without their preexisting advanced accounting knowledge, Associates could not understand KPMG's training, which only briefly refreshes key concepts and then moves quickly into instruction about applying those concepts in practice consistent with KPMG's audit methodology. JA-781-783, 786-788. For example, KPMG's "Auditing Inventory" training in Audit Fundamentals 2009 ran for 210 minutes. SA-10-11 (¶8(a)) & SA-417-494. The

34

course spent only 45 minutes discussing inventory topics before directing

participants to apply the concepts in simulated inventory audit procedures.  SA-10-

11 (¶8(a)).  In that short time, instructors addressed a variety of topics, including

the differences between "'perpetual and periodic inventory systems'" and

"'common risks associated with inventory,'" such as "'[o]verstatement of

inventory above its net realizable value,'" "'[o]verstatement of inventory due to

excess and obsolescence,'" "'[m]isstatement of inventory,'" which "'can affect

COGS [cost of goods sold], net income, accounts payable and other accruals,'" and

"'improper cut-off of inventory purchase and sales,'" which "'can affect ending

inventory, possible calculations of cost of goods sold (if periodic), accounts

payable and other accruals.'"  *Id.* (alterations in original).

    Instructors then provided an overview of inventory audit procedures that

Associates may perform, including:

- "Vouch a sample of purchases and sales of inventory to and from the perpetual inventory records to determine that they were appropriately recorded."

- "Perform pricing tests on a sample basis for raw materials, work-in-progress, and finished goods to ensure proper calculation of inventory costs."

- "Determine whether inventory is properly valued at the lower of cost or net realizable value and that any write-downs were properly charged to the inventory provision/allowance account."

- "Obtain a schedule of slow-moving and obsolete inventory, including those identified during the physical inventory count, and trace items to the inventory allowance account to ensure they were properly written down."

*Id.*

The same exercise could be performed for each of the other audit topics covered in training, such as auditing payroll, accounts receivable, accounts payable, fixed assets, and debt. SA-9 (¶7(b)). KPMG submitted its proprietary training materials in full to the district court. Dkt.267, Exs. C-II (*reproduced in part in* SA-13-494). The training materials are written at a level of complexity that shows one needs advanced knowledge to understand the material at issue. *See id.* They also demonstrate that if Associates' work was mindless—as plaintiffs contend—such training would not be necessary. *See id.*; *see also supra*, § I.A.2 (discussing training). The training materials therefore establish beyond question that Associates' primary duty requires advanced knowledge.

### 3. Associates' primary duty is predominantly intellectual in character and includes work requiring the consistent exercise of discretion and judgment.

Every Associate's primary duty is "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment." 29 C.F.R. § 541.301(b). In gathering and assessing the competency and sufficiency of audit evidence, performing audit procedures, and documenting their conclusions in work papers, Associates consistently exercise

discretion and judgment and use their advanced knowledge "to analyze, interpret or make deductions from varying facts or circumstances." *Id.*

As noted *supra* at 33, plaintiffs concede they performed the audit procedures described in Audit Fundamentals and that, in doing so, they were subject to professional standards requiring them to exercise judgment, professional skepticism, and due care.  Among other things, these standards require Associates to exercise professional skepticism and due care in "[g]athering and objectively evaluating audit evidence" to determine whether it is "competen[t] and sufficien[t]" to support the conclusions reached and to use "professional judgment … in determining the quantity, type, and content of audit documentation."  AU § 230.08; AU § 339 (2004); *see* JA-716-718 (¶¶53, 57-60); JA-760-761; SA-1139-1140.[11]

Consistent with these professional standards, KPMG expects and trains its Associates to exercise judgment and professional skepticism in all they do.  SA-11 (¶9) & SA-16-65; SA-497-504.  Associates are expected to "[c]onside[r] and evaluat[e] all relevant factors when making decisions," "[s]ugges[t] alternative solutions to solve problems," and "[e]xercis[e] sound judgment in referring issues to more senior staff."  JA-1719; JA-1725; *see also* JA-726-729.  Associates must

---

[11] Plaintiffs' attempt to re-write what the professional standards require in an effort to downplay the importance of their own work, *see* Br. 14-15, should be rejected. On their face, *see supra*, 7-8, the standards governing "professional skepticism" require far more than that Associates not act "'mindlessly.'"  Br. 15.

"[i]dentify potential accounting and audit issues and appropriately document the issues and their conclusions and consult with appropriate Firm members as necessary."  JA-747.  In addition, KPMG instructs Associates to:

- Consider and help identify fraud risk factors throughout all their activities on the engagement.

- Be aware of where we document our understanding of (and response to) these fraud risk factors.

- Consider the documentation that they produce and not simply follow the prior year file.  This could include challenging the in-charge as to why they are performing certain tests, identifying useful further testing to be undertaken, etc.

SA-99 (emphasis omitted).

In performing their assigned procedures, Associates make judgments upon which more senior members of the team rely.  JA-702-703 (¶¶4-5); JA-792, SA-505; JA-1673-1675; JA-1687-1688.  As a result, the vast majority of their work involves judgment and discretion.  JA-538 (¶37); *see* JA-398-399 (¶¶27-29); JA-405-406 (¶¶15-16, 18); JA-419 (¶29); JA-429 (¶24); JA-437 (¶24); JA-448 (¶23), 449 (¶25); JA-459 (¶27); JA-468 (¶25); JA-482 (¶31); JA-496 (¶38); JA-504-505 (¶20); JA-514-515 (¶25); JA-525 (¶22).

Because it would be impossible to catalog the myriad types of audit work performed by Associates that require judgment and discretion, we highlight just a few examples of how Associates must exercise judgment and discretion in performing their primary duty.

**Assessing audit evidence.**  Professional standards require that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU §§ 150.02 (2010), 230.  Associates do not just obtain evidence for others to evaluate; rather, they are responsible for evaluating the evidence in the first instance and drawing conclusions about whether it is "'sufficient'" and "'competent.'"  JA-717-718 (¶¶58, 60).[12]

This process cannot be reduced to any mechanical formula and often requires application of inherently judgmental accounting principles.  An Associate might, for example, be required to assess the reasonableness of the client's assertions that (1) accounts receivable are properly allocated between a parent company and its subsidiary, JA-393 (¶13); (2) a hedged transaction will occur, JA-426 (¶¶17-18); (3) inventory is not obsolete, JA-472-473 (¶¶9-10); or (4) a lease is a capital lease rather than an operating lease, JA-522-523 (¶¶12-15); *see* JA-434-435 (¶¶16-18); JA-455-456 (¶¶14-15).  Assessing whether such accounting judgments are supported requires advanced knowledge, judgment, and discretion.

---

[12] Plaintiffs' assertion that they "were instructed just to collect and report information," Br. 40, is not supported by their record citations and is directly contrary to both KPMG's job expectations and training materials, *see* JA-1427-1431 (¶65), and professional standards, which require all auditors to critically assess evidence throughout the engagement, AU § 230.

**Inquiring about anomalies.**  Associates must also use judgment and discretion to identify anomalies or discrepancies between audit evidence and expectations and to assess whether they reflect errors or whether additional audit procedures may be necessary.  JA-718 (¶59); JA-1674-1675; SA-1130-1132.  For example, in conducting a walkthrough, an Associate might discover that the client failed to follow its internal controls.  The Associate would then have to exercise judgment in inquiring about the variance and determining whether the client's explanation was reasonable and whether to obtain additional evidence.  JA-768, 772, 775-776.

Similarly, in performing test work on a company's accounts payable and accrued liabilities, an Associate might discover that the company had a debit balance in a liability account and, based on her advanced accounting knowledge, recognize that this is atypical.  The Associate would then have to exercise judgment and discretion in asking additional questions to determine whether the account should be reclassified as an asset account.  JA-502-503 (¶¶13-14).  Examples could easily be multiplied.  *See*, *e.g.*, JA-777-778; JA-393 (¶13), 396-397 (¶¶20-21); JA-401-402 (¶7); JA-445-446 (¶17); JA-465-466 (¶16); JA-488 (¶13); JA-521 (¶10).

**Researching accounting or auditing issues.**  Associates are expected to identify accounting or auditing issues relevant to their assignments that may

require independent research, to consult the professional literature, and to report their analysis and conclusions to senior team members.  JA-716 (¶54); JA-774; JA-392-393 (¶12).  One Associate, for example, might need to research whether a cellular service provider must reduce the revenue it records by the amount it pays its suppliers.  JA-424 (¶¶11-12).  Another might need to research whether product sitting in a rail car should be counted as inventory.  JA-403-404 (¶11).  Associates must use judgment and discretion in completing these assignments just like associates at a law firm must do so in recognizing legal issues, performing legal research, and drafting memos reporting their conclusions.

**Documenting findings in work papers.**  Professional standards require auditors to prepare audit documentation "in sufficient detail to provide a clear understanding of the work performed (including the nature, timing, extent, and results of audit procedures performed), the audit evidence obtained and its source, and the conclusions reached."  AU § 339.03 (2004); *accord* AS No. 3.  "The exercise of professional judgment is integral" to this process.  AU §339.01 (2004).  Thus, Associates must exercise judgment to determine what information another auditor would need to re-perform the audit, what information is not essential, and what supporting documentation is necessary to support the conclusions reached.  SA-340-360; JA-716-717 (¶¶53, 57); JA-510-511 (¶14), 513 (¶19).

41

Consistent with the foregoing responsibilities, at least 351 of the opt-in plaintiffs obtained CPA licenses, 323 within three years of their hire date, presumably relying on work performed as Associates to meet the accounting experience requirement for licensure.  JA-1727-1735.  Most states require one to two years of substantive public accounting experience or other accounting work for licensure.  Although formulations vary from state to state, some states explicitly demand that qualifying work experience involve independent thought and judgment.  Texas, where plaintiff Pippins worked, requires that work experience "must be of a non-routine accounting nature which continually requires independent thought and judgment on important accounting matters."  22 Tex. Admin. Code § 511.122(c).  *See also*, *e.g.*, Conn. Agencies Regs. § 20-280-24(e)(1)-(3) (same).[13]  The work experience requirements for licensure thus further establish that Associates' work entailed the exercise of judgment and discretion.

### 4.    Plaintiffs' contrary arguments lack merit.

Against this overwhelming evidence that Associates must consistently exercise judgment and discretion in performing their primary duty, plaintiffs advance five basic arguments.  None has merit.

---

[13] Other states emphasize the substantive nature of the required work experience. *See*, *e.g.*, Or. Admin. R. 801-010-0065(3) (requiring achievement of certain "competencies," including "[s]kills in decision making, problem solving, critical analytical thinking"); *see also* JA-556-558 (¶¶124-130).

*First*, the district court rightly declined to use the administrative exemption's definition of "discretion and independent judgment."  Br. 35-38.  As DOL has recognized, "the 'consistent exercise of discretion and judgment' standard under the learned professional exemption is *less stringent* than the 'includes work requiring the exercise of discretion and *independent* judgment' standard of the administrative exemption."  69 Fed. Reg. at 22151 (first emphasis added).

Plaintiffs assert that DOL's interpretation "'is not controlling over the language of the regulation itself.'"  Br. 37 n.4.  That is true as far as it goes, but is irrelevant here.  Plaintiffs do not identify any conflict between the regulation and DOL's interpretation of it, or show that the regulation's language compels a different result.  On the contrary, the professional exemption does not define "discretion and judgment," and the professional and administrative exemption regulations facially differ from one another.  DOL's interpretation is not "plainly erroneous or inconsistent with the regulation[s]" and is therefore "controlling." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *accord Talk Am., Inc. v. Mich. Bell. Tel. Co.*, 131 S. Ct. 2254, 2262 (2011).

Accordingly, the court correctly followed DOL's interpretation and properly applied the ordinary meaning of "discretion and judgment."  SPA-37-38.  The ordinary meaning of these terms readily encompasses the exercise of judgment, professional skepticism, and due care as required by the professional standards.

43

And this is a question of law for the court, *see Ramos*, 687 F.3d at 558, not for "[a] reasonable factfinder," Br. 42.

Regardless, under any definition, plaintiffs' primary duty includes work requiring the consistent exercise of discretion and judgment. As shown above, plaintiffs' primary duty includes work involving "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). For example, in conducting a walkthrough or an inventory observation, Associates must determine whether there are any variances or anomalies that require follow-up questions, and if so, they must decide what questions to ask, evaluate the sufficiency of the client's answer, and assess whether additional procedures may need to be performed. *See* SPA-45, 48-49 (Associates "are not given a script to follow in their contact with clients"). In this respect, Associates are no different from associates at law firms who conduct witness interviews.

*Second*, that Associates' primary duty includes routine or mechanical work does not defeat the exemption. Plaintiffs argue that the most time-consuming part of their job consisted of physical or routine tasks such as counting items, inputting numbers in spreadsheets, or comparing numbers in documents. Br. 33-34. Even if that were true, it would not show that their primary duty was nonexempt work. The responsibilities plaintiffs describe are "directly and closely related to" the

44

inherently judgmental and discretionary aspects of audit work performed by

Associates and thus also qualify as exempt work.  *See* 29 C.F.R. § 541.703(a);

*Piscione*, 171 F.3d 543 ("an employee may be required to collect information, but

would still be within the professional exemption if he had to interpret that data as

well"); *supra*, 32-33.

      Moreover, even if the routine tasks were deemed nonexempt work, and even

if they consumed a substantial percentage of plaintiffs' time, this still would not

show that such tasks were plaintiffs' primary duty.  "[N]othing in [the regulations]

requires that exempt employees spend more than 50 percent of their time

performing exempt work."  29 C.F.R. § 541.700(b).  The overriding consideration

is which duties are "most important" to the employer, *id.* § 541.700(a), and no

reasonable fact-finder could conclude that the duty of Associates most important to

KPMG is counting, taking notes, or populating spreadsheets, as opposed to the

judgmental and discretionary duties inherent in gathering, assessing, and

documenting audit evidence in accordance with professional standards that KPMG

itself must satisfy.  *See Rutlin*, 220 F.3d at 742 (where the duties that "were of

principal importance" to the employer were exempt, the employee was exempt

even if he "performed collateral tasks" and "even if those tasks took more time

than his primary duties"); *Reich*, 993 F.2d at 742; *supra*, 31-32.

*Third*, it does not matter that Associates have audit programs or templates to assist them. Br. 34-35. These materials provide only high-level guidance concerning audit objectives and KPMG's audit methodology and internal policies; they do not provide exact instructions or eliminate the need to exercise judgment and discretion to satisfy professional standards. JA-708-709 (¶¶26-27); JA-762; SA-1114-1117; *see also In re KPMG*, 2012 WL 5416939, at *8 (concluding that although the KPMG Audit Manual "obviously provided guidance to and assisted [plaintiff] in performing her primary duties, it certainly did not prevent her from exercising her discretion or judgment"). Indeed, KPMG provides "*[a]ll* professionals in [its] Audit Practice," including licensed CPAs, with KPMG's proprietary audit manual and other guidance. JA-708-709 (¶27).

The regulations expressly provide that "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical … financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption." 29 C.F.R. § 541.704. Accordingly, "reliance on such guidelines does not, by itself, indicate the lack of professional discretion and judgment." *Owsley*, 187 F.3d at 526-27; *see De Jesús-Rentas*, 400 F.3d at 76 ("the existence of standard procedures and guidelines does not mean that the [employee's] responsibilities do not require the … consistent exercise of discretion and

46

judgment") (internal quotation marks and alteration omitted); 69 Fed. Reg. at

22188-89 (explaining that an outlier district court decision holding that reliance on

manuals made employees non-exempt was an "absurd result").

As the district court recognized, moreover, Associates are in this respect no

different from licensed CPAs, who "are required, by law and professional rules, to

follow particular procedures and to apply set standards in carrying out their work."

SPA-45.  They are nonetheless exempt professionals.  *See* 69 Fed. Reg. at 22152

("[S]ome learned professionals in the modern workplace are required to comply

with national or international standards or guidelines.  [CPAs] have not under

current law, and will not under the final rule, lose the learned professional

exemption because they follow [GAAP].").

*Fourth*, neither the fact that plaintiffs were supervised and had their work

reviewed by more senior auditors nor the fact that they lacked authority to make

final decisions regarding KPMG's audit report renders them non-exempt.  *See*

Br. 39-41, 13.  Even under the stricter standard for the administrative exemption,

"the exercise of discretion and independent judgment may consist of

recommendations for action rather than the actual taking of action," and that is true

"even if th[e] [employee's] decisions or recommendations are reviewed at a higher

level."  29 C.F.R. § 541.202(c).  By plaintiffs' logic, a law firm associate who

performed legal research, formulated arguments, and prepared an initial draft of a

brief would be performing non-exempt work because a partner reviewed the draft and signed the brief filed in court.  That, of course, is not the law.  *See Owsley*, 187 F.3d at 526-27 (holding that trainers who worked under the supervision of physicians were exempt professionals); *cf. Hines v. State Room, Inc.*, 665 F.3d 235, 238, 245-46 (1st Cir. 2011) (holding that sales managers were exempt administrators even though they lacked final decision-making authority as to employer's finances and contracts).

Indeed, as the district court observed, and as plaintiffs recognize, "the industry's professional standards require *both* that certain procedures be followed *and* that everyone's work be extensively supervised and reviewed."  SPA-46; Br. 15-16.  To comply with those standards, Associates' work, "including the audit documentation, should be reviewed to determine whether it was adequately performed and documented and to evaluate the results, relative to the conclusions to be presented in the auditor's report."  AU § 311.31.  That Associates' work is supervised and reviewed only underscores that their work is exempt.

*Fifth*, plaintiffs cannot avoid summary judgment through their own conclusory assertions that their "primary duties did not involve the exercise of discretion or independent judgment."  *E.g.*, JA-344 (¶20); *see* Br. 9-10.  Such assertions merely state a legal conclusion; they do not supply evidence creating a genuine issue of material fact.  *See*, *e.g.*, *Mullins v. City of N.Y.*, 653 F.3d 104, 113

48

(2d Cir. 2011) (what an employee's primary duty consists of "is a question of law subject to *de novo* review"). This Court is not "'bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). The district court properly concluded that plaintiffs' "testimony in this regard qualifies as argument" and should "be treated as such." SPA-19-20.

Furthermore, plaintiffs' efforts to portray their job as routine and mechanical are contradicted by their own testimony, performance reviews, résumés, and sworn submissions to state licensing boards. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (a party cannot "defea[t] summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *Piscione*, 171 F.3d at 543-45 (upholding summary judgment for employer based on professional exemption where, despite attempting to portray his job as routine, plaintiff's deposition testimony and résumé made clear that his "job depended on advanced knowledge"); *In re KPMG*, 2012 WL 5416939, at *8 (holding that senior audit associate could not "create a genuine issue of material fact [about the intellectual nature of her duties] by contradicting her prior statements under penalty of perjury to the [CPA] licensing board").

Plaintiffs acknowledged, for example, that they reached personal conclusions using their judgment, JA-1161-1163, 2316-2320; that they were

49

responsible for identifying anomalies, asking follow-up questions, and always being alert for indications of fraud, JA-2324-2325, 1117-1118, 2327; JA-2332-2336; SA-1207-1211; that they used judgment in documenting their thought processes and findings in work papers, SA-1189-1194; SA-1195-1201; SA-1231-1236; JA-2339; and that their work allowed them to improve their technical auditing skills, JA-2321; SA-1171; SA-1186-1187; SA-1202-1206; SA-1207-1211; SA-1212-1216; SA-1242-1247.

Plaintiffs also represented on their résumés and in affidavits that they gained substantive audit experience at KPMG by "[a]ssess[ing] the appropriateness of conclusions based on sufficient, relevant data," "[e]valuat[ing] the appropriateness of financial information, disclosures, or transactions in accordance with the appropriate basis of accounting," and "identify[ing] and assess[ing] factors that may indicate the presence of fraud."  JA-2347; *see also* JA-1693; JA-1697-1698; JA-1705; JA-1706-1707.  Not only are plaintiffs' claims in tension with these representations, they are fundamentally inconsistent with the rigorous work experience requirements for licensure.  *See supra*, 42.[14]

---

[14] Plaintiffs' attempt (Br. 40-42) to liken Associates to the bookkeepers in *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 677 F. Supp. 2d 544 (D. Conn. 2009), and *Brock v. National Health Corp.*, 667 F. Supp. 557 (M.D. Tenn. 1987), fails for the many reasons the court below detailed.  SPA-41-44.  For instance, in *Hendricks*, the employees conducted "internal bookkeeping" that "an Audit Associate from KPMG or some other outside auditor would subsequently review to

Finally, to the extent plaintiffs did not exercise discretion and judgment in their work as Associates, this would show only that they were not meeting KPMG's expectations.  Plaintiffs concede that KPMG's job description materials are "good descriptions of what KPMG expects of Audit Associates."  JA-795 (¶193).  And an employee cannot concoct an FLSA claim through his own "failure to perform adequately the duties that are expected of him."  *Whittlesey v. Union Carbide Corp.*, 567 F. Supp. 1320, 1325 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 724 (2d Cir. 1984); *accord Grace v. Family Dollar Stores, Inc.*, No. 08-1932, 2012 WL 3191354, at *6-7 (W.D.N.C. Aug. 3, 2012); *Taylor v. Autozone, Inc.*, No. 10-8125, 2012 WL 254238, at *7 (D. Ariz. Jan. 27, 2012); *cf. Ramirez v. Yosemite Water Co.*, 978 P.2d 2, 13 (Cal. 1999) (same under state labor law); *Marx v. Friendly Ice Cream Corp.*, 882 A.2d 374, 386 (N.J. Super. App. Div. 2005) (same).

Thus, for example, plaintiffs cannot show that preparing work papers was simply a routine matter of "rolling forward" data from prior years when they were criticized in performance reviews, and two of them even placed on performance improvement plans, precisely because they relied excessively on prior year work papers.  SA-1195-1201; SA-1217-1226; SA-1231-1236; JA-2340-2344.  Likewise, plaintiffs cannot show that they were mere automatons performing mindless work under close supervision when their own performance evaluations make clear that

---

make sure it complied with professional standards," SPA-43, and the employees in *Brock* were not required to "possess a college-level degree at all," SPA-44.

they were expected to work independently, think critically, apply their advanced

accounting knowledge, and be resourceful in finding answers to questions—*i.e.*,

behave like professionals.  SA-1168-1172; SA-1173-1176; SA-1207-1211; SA-

1227-1230; SA-1231-1236; SA-1237-1241; SA-1242-1247; SA-1143-1150.

For all these reasons, plaintiffs' arguments fail to show a genuine issue of

material fact or legal error justifying reversal.

## II. THE COURT DID NOT ABUSE ITS DISCRETION IN DENYING PLAINTIFFS' MOTION FOR ADDITIONAL DISCOVERY.

Plaintiffs claim the district court should have granted their Rule 56(d)

motion for additional discovery and that summary judgment was "prematur[e],"

because the parties had completed only the first phase of the bifurcated discovery

plan and plaintiffs had not yet obtained information supposedly necessary to

oppose summary judgment.  Br. 50.  This claim is meritless.

Plaintiffs face a daunting burden.  "It is axiomatic that the trial court enjoys

wide discretion in its handling of pre-trial discovery."  *Wills v. Amerada Hess*

*Corp.*, 379 F.3d 32, 51 (2d Cir. 2004); *accord EM Ltd. v. Rep. of Arg.*, 695 F.3d

201, 207 (2d Cir. 2012) ("Of course, as in all matters relating to discovery, the

district court has broad discretion to limit discovery in a prudential and

proportionate way.").  The district court's ruling is "subject to reversal only if [the

court] abused its discretion."  *Paddington Partners v. Bouchard*, 34 F.3d 1132,

1137 (2d Cir. 1994).  "Reversal of a judgment because of an improper order

52

denying or curtailing discovery is 'unusual.'" *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 523 (2d Cir. 1996), *overruled on other grounds*, *New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003).

Far from abusing its discretion, the district court admirably managed discovery in this multi-faceted case.  Having already presided over extensive proceedings related to collective certification, the court bifurcated discovery because the "issue of whether *all* Audit Associates are … professionals … does not require much additional discovery, and may well be amenable to a motion for summary judgment at an early moment." JA-585.[15]  The court found that the question whether all Associates are exempt professionals was discrete and potentially dispositive, and that broader discovery made little sense and would impose considerable expense.  JA-601, 614.

On appeal, plaintiffs complain that the district court improperly "deferred [their] requests for broader discovery."  Br. 52.  This complaint rings hollow.  Given plaintiffs' conduct below, the extensive discovery they received, and their failure to pursue evidence that was readily available to them, plaintiffs cannot show an abuse of discretion.

---

[15] Contrary to plaintiffs' claim that the court's bifurcated discovery plan was "unique," Br. 51, courts commonly bifurcate or stage discovery, including in FLSA cases, to facilitate early resolution of key issues.  *See*, *e.g.*, *Comer v. Walmart Stores, Inc.*, 454 F.3d 544, 546-47 (6th Cir. 2006) (noting bifurcation of discovery is common in FLSA cases); *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 347 (W.D.N.Y. 2011).

## A.    Plaintiffs' Conduct Forecloses Their Argument That The District Court Abused Its Discretion.

Plaintiffs' argument that the court abused its discretion in handling discovery is foreclosed by their conduct below.  As this Court has recognized, a "claim of lack of discovery cannot be entertained on appeal" when plaintiffs "assured the district court that sufficient discovery had been conducted." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 91 (2d Cir. 1984).  Here, plaintiffs cannot fault the district court when they (1) expressly assented to the district court's bifurcated discovery plan, (2) agreed to defer additional discovery until after the resolution of summary judgment motions, and (3) cross-moved for summary judgment.

*First*, when the parties appeared before the district court to discuss the discovery plan, plaintiffs unequivocally endorsed the court's proposal to bifurcate discovery.  The court explained that the case could be simplified by first determining, on a collective-wide basis, whether all Associates are exempt by virtue of their educational backgrounds and job duties.  JA-598, 601, 609-610.  Plaintiffs agreed:  "Your Honor, we agree with it.  We like the structure the court has set up because we think it is appropriate."  JA-608.  Given the agreed purpose of early summary judgment motions, the court suggested that it was unnecessary to conduct "a whole big boatload of discovery … on individualized things."  JA-614.  Remarkably, plaintiffs cite this as support for their argument that the court improperly denied discovery, Br. 52, but they ignore the transcript's very next line

54

in which plaintiffs stated:  "we agree that this case should be litigated the way that the court is contemplating."  JA-614; *see* JA-591 (agreeing that "this individualized stuff is silly").

Of course, plaintiffs were in no position to disagree with the court's proposal because insisting on the need for individualized discovery would have called into question their ability to proceed as a collective or class.  Having lost on summary judgment, plaintiffs now claim they needed extensive individualized discovery to evaluate Associates' primary duty.  Br. 56-59.  But they told the court the exact opposite:  "[T]he definition of 'primary duty' under the FLSA … is not an individualized determination."  JA-606-607.

*Second*, consistent with the court's discovery plan, plaintiffs agreed to defer much of the discovery they now contend was essential until after summary judgment.  *Supra*, 16; JA-621-623 (deferring individual discovery of Associates and their supervisors); JA-636 (deferring additional corporate-level discovery).  Although plaintiffs claim these agreements were "without prejudice" to their Rule 56(d) motion, they do not explain how the district court could have abused its discretion by denying them discovery they had voluntarily agreed to defer in accordance with a discovery plan they had endorsed.

*Third*, plaintiffs cross-moved for summary judgment, thereby affirming that the record was sufficient to decide the exemption question as a matter of law.  *See*

Fed. R. Civ. P. 56(a).  "[T]he making of such a motion almost invariably indicates

that the moving party was not prejudiced by a lack of discovery."  *Filiatrault v.*

*Comverse Tech., Inc.*, 275 F.3d 131, 138 (1st Cir. 2001).  Indeed, plaintiffs' cross-

motion included 418 purportedly undisputed material facts, and relied upon

depositions of plaintiffs and three corporate-level KPMG witnesses, in addition to

several hundred pages of documents produced by KPMG.  JA-295 (Dkt.271); JA-

797-803 (¶¶10-69).  The district court did not abuse its discretion in denying

*further* discovery on the very issue that plaintiffs saw fit for summary disposition.

*See Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir.

2000) (no abuse of discretion in denying further discovery where plaintiffs had

cross-moved for summary judgment); *Oneida Indian Nation v. City of Sherill*, 337

F.3d 139, 168 (2d Cir. 2003) (same where party moved for summary judgment and

submitted "voluminous evidence"), *rev'd on other grounds*, 544 U.S. 197 (2005).[16]

---

[16] None of the cases plaintiffs cite supports their contention that Rule 56(d)
"protects" them despite their cross-motion for summary judgment.  Br. 56.
*Lumbermens Mutual Casualty Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46
(2d Cir. 2010), did not involve a Rule 56(d) motion.  In *Boucher v. Sears*, No. 89-
1353, 1995 WL 283742, at *14 (N.D.N.Y. May 8, 1995), the court granted
plaintiffs' motion for additional discovery without referring to their cross-motion
for summary judgment or analyzing the implications of the concurrent filings.  In
*Jones v. Hirschfeld*, No. 01-7585, 2003 WL 21415323, at *3 (S.D.N.Y. June 19,
2003), additional time to seek discovery was warranted because of the "almost
complete lack of discovery," and the *pro se* movant had been imprisoned.

**B.    Plaintiffs Obtained Extensive Discovery And Failed To Diligently Pursue Evidence That Was Readily Available To Them.**

The denial of additional discovery was also "well within" the court's discretion because plaintiffs already had "conducted extensive discovery," *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 622 (2d Cir. 1988), and because they failed to "diligently pursu[e]" readily available evidence, *Paddington*, 34 F.3d at 1139.

Contrary to plaintiffs' claims, KPMG's document production was voluminous and comprehensive, consisting of nearly 300,000 pages. JA-2147-2149 (¶¶5-7). Plaintiffs suggest that KPMG produced only its "hand-selected corporate-level emails and corporate documents," Br. 52, but they fail to show how the custodians whose documents KPMG made available were in any way inadequate. Asked by the magistrate judge why KPMG's list of custodians was not "a pretty good list" given "the[ir] identities and what their responsibilities are," plaintiffs responded only: "We might think it's a pretty good list." JA-634. Moreover, KPMG also produced individual-specific evidence including personnel files, engagement and performance reviews, and time records for six Associates, including the named plaintiffs and certain opt-in plaintiffs. JA-2147-2148 (¶5).

Additionally, plaintiffs deposed three upper-level KPMG witnesses for six days. *Id.* Plaintiffs argue the court did "not allo[w]" depositions of other KPMG employees. Br. 52. But no order limited plaintiffs to these three deponents, and

57

plaintiffs did not even notice depositions of any other KPMG employees.  *See Demery*, 216 F.3d at 286 (affirming denial of Rule 56(d) motion where plaintiffs failed to serve discovery requests or seek an order compelling discovery).

Plaintiffs do not explain why this discovery was inadequate or why the additional discovery they sought would not have been cumulative.  *See B.F. Goodrich*, 99 F.3d at 523-24 (affirming denial of discovery because, although "more discovery might have been helpful," in a complex case "it is hard to fault the district court for placing limitations on discovery").  Instead, plaintiffs make the bare assertion that additional discovery "would have painted a very different picture."  Br. 56; *see id.* at 59 (postulating that re-examining KPMG witnesses about subsequently produced materials would create a genuine issue of material fact).  Such speculation provides no basis for reversal.  *See Paddington*, 34 F.3d at 1138 ("A court can reject a request for discovery" that is "based on speculation as to what potentially could be discovered"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001); *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981).  Plaintiffs "were given reasonable access to [KPMG employees and documents], and the district court was well within its discretion in denying [their] request for additional discovery." *Contemporary Mission,* 842 F.2d at 622.

Moreover, plaintiffs had access to much of the information they purportedly needed.  Plaintiffs claim they needed additional information about Associates' duties, Br. 56-57, but they had ready access to the best possible source of information:  the 1,000-plus Associates they represent.  Yet plaintiffs did not submit a single declaration from any of those Associates during the summary judgment proceedings.  *Cf. Lambert v. KPMG, L.L.P.*, No. ESX-L-5225-11, slip op. at 7 (N.J. Super. Ct. Law Div. Aug, 2, 2013) (rejecting plaintiff's "argument that he lacked a full and fair opportunity to obtain discovery" in this case because "he was uniquely positioned to know what he did during the course of his employment at KPMG"), *appeal filed* (N.J. Super. App. Div. Sept. 13, 2013).

Likewise, plaintiffs claim they needed discovery from Associates' supervisors, Br. 57, but they did not use the KPMG-provided supervisor contact information or submit any declarations from the many opt-in plaintiffs who supervised Associates during their time at KPMG.  *See* JA-2148-2149 (¶7).  They claim they needed a sampling of audit work papers, Br. 59, but they declined to review those that KPMG made available, JA-2149 (¶10).  And they complain that they did not have an opportunity to examine Associates' hard drives, Br. 54, but they never requested production of hard drives during the initial discovery period. Rather, they agreed to defer such production.  JA-622 (¶5).

59

"Requests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored." *Paddington*, 34 F.3d at 1139.  A party seeking additional discovery must describe "the efforts [it] has made to obtain those facts" and "why those efforts were unsuccessful." *Id.* at 1138.  Given that plaintiffs made no effort to obtain or produce evidence that was readily accessible to them, the court did not abuse its discretion in denying their Rule 56(d) motion.  *See id.* at 1139; *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 n.1 (2d Cir. 2004) (denial of additional discovery proper because plaintiff had opportunity to obtain it); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989) (same).

## CONCLUSION

For these reasons, the district court's decision granting summary judgment to KPMG should be affirmed.

September 26, 2013                              Respectfully submitted,


                                              /s/ *Carter G. Phillips*

Michael C. Kelley                             Carter G. Phillips
Jennifer Altfeld Landau                       Eric D. McArthur
SIDLEY AUSTIN LLP                             SIDLEY AUSTIN LLP
555 W. 5th Street                             1501 K Street, NW
Los Angeles, CA 90013                         Washington, DC  20005
(213) 896-6000                                (202) 736-8000

                                              Eamon P. Joyce
                                              SIDLEY AUSTIN LLP
                                              787 Seventh Ave.
                                              New York, NY  10019
                                              (212) 839-8555

                                              *Attorneys for Defendant-Appellee*
                                              *KPMG LLP*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

This brief complies with the type-volume limitations of Fed. R. of App. P. 32(a)(7)(B) because this brief contains 13,237 words (as determined by the Microsoft Word 2007 word-processing program used to prepare this brief), excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. of App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing program in 14-point Times New Roman font.

/s/ *Eamon P. Joyce*
Eamon P. Joyce
Attorney for Defendant-Appellee
KPMG LLP

# CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October 2013, I electronically filed and served the foregoing, final version of this brief using the CM/ECF System.  On the 26th day of September 2013, I served a page-proof version of this brief.

/s/ *Carter G. Phillips*
Carter G. Phillips
Attorney for Defendant-Appellee
KPMG LLP